**DURAKOOL, INC., Appellant,**

v.

**MERCURY DISPLACEMENTS INDUS-
TRIES, INC., et al., Appellees.**

No. 3–1179A322.

Court of Appeals of Indiana,
Third District.

June 29, 1981.

David R. Melton, Thornburg, McGill, Deahl, Harman, Carey & Murray, South Bend, for appellant.

Vincent P. Campiti, May, Oberfell, Helling, Lorber, Campiti & Konopa, South Bend, for appellee Joseph Witcher.

STATON, Judge.

Durakool, Inc. filed an action against Mercury Displacement Industries, Inc. (Mercury), George H. Elenbaas, Ben Brewers and Joseph B. Witcher, seeking injunctive and monetary relief. After a hearing on the motions for summary judgment, made by both Durakool and Witcher, the court granted Witcher's motion and denied Durakool's motion for partial summary judgment. It found that there was no genuine issue as to any material fact "with reference to the plaintiff's contentions as against the defendant, Joseph Witcher." Because Durakool's claims as to the other defendants remained pending, the court "certified"[1] its judgment as to Witcher.

On appeal, Durakool raises two issues for our consideration:

(1) Did the court err in its granting of Witcher's motion for summary judgment?

---

1. With respect to TR. 54(B) and TR. 56(C), an express direction for the entry of judgment and an express determination that there is no just reason for delay amount to a "certification that a particular judgment is ripe for review." *Stanray Corporation v. Horizon Construction, Inc.* (1976), 168 Ind.App. 164, 342 N.E.2d 645, 651.

(2) Was the agreement between Durakool and Witcher a valid and enforceable restrictive covenant?

We affirm as to Counts I through VI and reverse and remand as to Count VII.

## I.

### Summary Judgment

When reviewing the granting of a summary judgment, we may only look to see whether the trial court correctly applied the law and whether there is any genuine issue of material fact. *Tekulve v. Turner* (1979), Ind.App., 391 N.E.2d 673. The party seeking the summary judgment has the burden of establishing that there are no genuine issues as to any material facts and any doubt must be resolved against the movant. *Ang v. Hospital Corp. of America* (1979), Ind.App., 395 N.E.2d 441. The evidentiary matters before the court are, therefore, construed in a light most favorable to the nonmoving party. *Tekulve, supra.* Only if no issue as to any material fact is raised may the court grant a summary judgment. To defeat such a motion, the opposing party need only to show that a material fact is genuinely in issue. *Brandon v. State* (1976), 264 Ind. 177, 340 N.E.2d 756.

In the case at hand, Durakool vigorously argues that Counts I through V of its seven-count complaint set out five separate causes of action. Our reading of the complaint persuades us otherwise. In essence, Durakool charges Witcher[2] with conspiracy to commit and with the commission of acts which constitute unfair competition.[3] These charges are based upon the alleged appropriation of Durakool's confidential engineering drawings, data, secret processes and designs.

Initially, we note that there is no cause of action for conspiracy as such. The proper cause of action is for damage resulting from a conspiracy. *Indianapolis Horse Patrol, Inc. v. Ward* (1966), 247 Ind. 519, 217 N.E.2d 626; *Miller v. Ortman* (1956), 235 Ind. 641, 136 N.E.2d 17. A civil conspiracy is a combination of two or more who, by a concerted action, seek to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means. *Bottoms v. B. & M. Coal Corp.* (1980), Ind.App., 405 N.E.2d 82, 90. If the complaint is to state a valid cause of action, the plaintiff must allege that the defendants conspired to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Indianapolis Horse Patrol, Inc., supra.* Clearly, the actions of Brewers, Elenbaas and allegedly Witcher in the formation of Mercury Displacement Industries, Inc.,[4] a company which manufactures mercury relays and switches, did not involve an unlawful purpose. There could be no unlawful purpose in their decision to form a company which would be in competition with Durakool for certain product lines.

The sole question, therefore, is whether they agreed to accomplish the lawful purpose of forming Mercury by unlawful means, i. e., the appropriation of confidential engineering drawings, data and secret processes belonging to Durakool. *See Koehring Company v. National Automatic Tool Co.* (Ind.S.D.1966), 257 F.Supp. 282, 290. We have reviewed the record and

---

**2.** Witcher was named as a party to this action in Durakool's First Amended Complaint. The initial complaint, naming as defendants Mercury, Elenbaas and Brewers, set out the same causes of action, but for the breach of covenant count.

**3.** It appears to us that the framing of this issue in terms of the doctrine of "unfair competition" is inappropriate. The test of unfair competition is whether the acts of the defendant are such as are calculated to deceive the ordinary buyer making his purchases under the ordinary conditions which prevail in the particular trade to which the controversy relates. *See* 87 C.J.S. Trademarks, Etc. § 92 (1954). Such a doctrine is inapplicable to the facts-at-bar. Nonetheless, the thrust of Durakool's claim as to the alleged appropriation of confidential scientific information by Witcher is clear.

**4.** The name of Mercury Displacement Industries, Inc. was changed, by reason of amendment to the Articles of Incorporation on February 16, 1976, from the company name of Duracraft, Inc. Duracraft had been formed on April 21, 1975.

conclude that there is no evidence to support the claim that Witcher appropriated any trade secrets, confidential engineering drawings or design data. There is also no evidence to indicate that he encouraged others to do so.

▮ Two of Mercury's founders were defendants Brewers and Elenbaas, both former employees of Durakool. Elenbaas, a registered electrical engineer, and Brewers, a sales manager, had been employed by Durakool for a number of years. Witcher, who had been employed as the company's general manager prior to his resignation, had no engineering background and knew nothing about the complexities of design engineering. As such, he was hardly in a position to knowledgeably disclose or encourage the disclosure of any trade secrets, confidential engineering drawings or secret design data to a third party or, for that matter, to Elenbaas and Brewers to benefit them in the development of Mercury. Witcher cannot be held chargeable with the knowledge that Elenbaas and Brewers had acquired during their lengthy employment with Durakool. We agree with the trial court that there was no genuine issue as to any material fact with reference to Durakool's claims that Witcher had conspired to commit or had committed unfair competition by the appropriation of "confidential engineering drawings and data and secret processes and designs." The summary judgment, therefore, as to Counts I through V was properly granted.

▮ In Count VI, Durakool charges that Witcher has "intentionally interferred with business and contractual relationships between plaintiff and its customers" and has "attempted to induce and persuade customers of plaintiff to cease doing business with plaintiff."[5] We note that the tort of interference with contractual relationships by inducing a breach of contract has been recognized in Indiana. In order to recover

under such an action, five essential elements must be proven: 1) existence of a valid and enforceable contract, 2) the defendant's knowledge of the existence of this contract, 3) the defendant's intentional inducement of a breach of the contract, 4) the absence of justification, and 5) damages resulting from the defendant's wrongful inducement of the breach. *Monarch Indus., Etc. v. Model Coverall Service* (1978), Ind. App., 381 N.E.2d 1098; *Daly v. Nau* (1975), 167 Ind.App. 541, 339 N.E.2d 71.

On appeal, Durakool complains that the court's granting of the summary judgment was in error because "there is no evidence of record with regard to the existence of a contract between Joy"—one of Durakool's distributors—"and Durakool." As such, the company claims, "it is patently obvious that the grant of summary judgment on Count VI is clearly premature." Despite its assertion to the contrary, there is evidence in the record regarding the relationship between Joy and Durakool. According to the retired president of Durakool, there was apparently no written contract involved in the establishment of the Joy account. He explained:

"Q. The Joy account, approximately when was that set up or established?

"A. I can't say that, but many years back."

∴ *   *   *   *   *   *

"Q. And there was a contractual arrangement then set up between Durakool and Joy for the purpose of furnishing these time delay relays?

"A. I am not sure that we ever had a contract. I think we developed with them, and I don't think that there has ever been a contract. Now, there might have been.

"Q. In other words, you don't recollect anything in writing that—

5. When the current general manager of Durakool was asked to set out the "incidents of intentional interference with your business contacts and contractual relationships with your customers," he responded that "the only example that I can substantiate with hard evidence is that with Joy Manufacturing..." The evidence to which he refers are some of the in-house Durakool sales records which were allegedly given by one of the defendants to the purchasing agent of Joy Manufacturing.

"A. No.

"Q. A formal written agreement?

"A. No, I don't."

In its complaint, Durakool has impliedly alleged the existence of a contract in its allegations of tortious interference with business and contractual relationships. The existence of such a contract is not only refuted by the evidence, but unsupported as Durakool has failed to introduce any evidence of the very contract upon which its claim is based. The opponent of a motion for summary judgment may not rely upon the bare allegations made in the pleadings to avert judgment where the motion's proponent has established his entitlement to the requested relief. Ind. Rules of Civil Procedure, Trial Rule 56(E); *Bell v. Horton* (1980), Ind.App., 411 N.E.2d 648. Because Durakool has failed to offer any evidence in opposition, as to the existence of the contract, to support its action for tortious interference with contractual relationships, we are persuaded that there was no error in the court's finding that there was no genuine issue as to the existence of the contract

and in its granting of the summary judgment thereon.

## II.

### Restrictive Covenant

In Count VII, Durakool charges Witcher with breaching the terms of a restrictive covenant.[6] Because it has failed to challenge the granting of the summary judgment as to Paragraphs 2 and 4 of the agreement in its motion to correct errors, Durakool has waived our consideration of any alleged errors therein. *Krueger v. Bailey* (1980), Ind.App., 406 N.E.2d 665, 669. We will limit our discussion to Paragraphs 1 and 3.[7]

On appeal, each party devotes a substantial portion of its brief to a discussion of the proper interpretation of the restrictive covenant. Both ask that we construe the covenant and make a determination as to the reasonableness of its terms. Each focuses upon the geographic limitations set forth in Paragraph 1 as being the key to its enforce-

---

6. One week after the termination of his employment with Durakool—November 25, 1972 —Witcher signed a covenant not to compete with Durakool for a consideration of $10,000 plus benefits. On April 21, 1975, Mercury Displacement Industries, a company which competes with Durakool in the manufacture of mercury relays, was formed. While Witcher did not own stock at the time of the company's incorporation, he testified as to some involvement in the company's formation. His help in soliciting investors, investigating potential plant sites, acquiring a specialty welding machine and calling upon Durakool customers on behalf of Mercury, was explained by him as "I tried to help George, as I said, as a friend. He wanted to get in the competition world and so I said, 'Okay, I will try and help you.'"

7. Paragraph 1 provides:
   "1. Witcher and Barnes jointly and severally covenant with Durakool that neither of them, either separately, jointly or in association with others either directly or indirectly will for a period of three (3) years from the date of this agreement own, manage, operate, participate in nor be employed by or otherwise be connected in any manner with any firm, person, corporation or enterprise which would be competitive with the business of Durakool or any other subsidiary, subsidiaries, division or divisions of Durakool, in

any county in any state of the United States of America in which subsidiary, subsidiaries, division or divisions shall be engaged at the time of this agreement."
   Paragraph 3 provides:
   "3. Witcher and Barnes shall not for a period of three (3) years from the date of this agreement directly or indirectly comunicate [*sic*] with or contact any customer of Durakool, its subsidiaries and divisions for the purpose of soliciting such customer to purchase any goods or products of the type being manufactured or sold by the divisions or subsidiaries of Durakool. Witcher and Barnes confirm that the name, address and other information relating to the aforesaid "customers are confidential and constitute the exclusive property of Durakool and agree that they will not disclose any such confidential information to other persons or business enterprises. Witcher and Barnes recognize and acknowledge that the services heretofore rendered by them to Durakool were of a special and unique character and that Durakool made a substantial investment in the business with which Witcher and Barnes had been involved, and that the restrictions on Witcher and Barnes' activities as contained in this agreement are required for Durakool's reasonable protection."

ability.[8] Witcher urges that the covenant should be declared void because it does not contain reasonable, definite, geographic limits. Failing our finding the agreement unenforceable, he then suggests that we consider it to be valid and urges that he is entitled to the summary judgment as there are no genuine issues of material fact. Durakool, of course, contends that the covenant is enforceable and claims that there are genuine issues of material fact as to whether Witcher breached it. The company tries to persuade us that the geographic limitations are reasonable because Witcher, as the general manager of Durakool, was in charge of the company's business operations on a nationwide basis.

We are constrained to note, at this point, that the initial determination of whether the covenant is or is not enforceable is not ours to make. It is to be made by the trial court and then reviewed for error by the Court of Appeals. Unfortunately, however, the court never made this pivotal determination. Its indecision as to the validity of the restrictive covenant is apparent from the judgment:

"The Court finds that with reference to the plaintiff's contention as to Witcher, there are no genuine issues as to any material fact and that defendant Witcher is entitled to judgment as to plaintiff's contentions as a matter of law on the following separate and independent legal grounds:

\*　　\*　　\*　　\*　　\*　　\*

"2. If the covenant agreement is construed broadly in favor of the covenantee, Durakool, the covenant agreement would be void under Indiana law because under Durakool's construction it would not contain reasonable, definite, geographic limits.

"3. If the covenant agreement is construed against the covenantee Durakool, as it must be, it is clear as a matter of law that Witcher did not violate the covenant agreement.

"4. No matter how the covenant agreement is construed, Witcher did not violate the covenant agreement...."

Upon close analysis of the judgment,[9] it is not clear to us whether the court felt that the covenant was unenforceable and Witcher, therefore, could not have violated it or whether it was enforceable and that there was no genuine issue of material fact as to whether he violated it.

■　　Without the trial court's initial determination of the enforceability of this covenant, we are in a poor position to review this matter. When reviewing the granting of a summary judgment, we may only look to see whether the trial court correctly applied the law and whether there is a genuine issue of material fact. *Tekulve v. Turner* (1979), Ind.App., 391 N.E.2d 673. In view of the fact that the trial court never made this key determination and that we, as a result, are unable to ascertain whether it "correctly applied the law," the use of a summary judgment as to Count VII was inappropriate. Perhaps the court's confusion on this matter could be attributed, in part, to the inadequacy of the record as to the extent of Durakool's business activities. Although the locations of Durakool's sites were detailed in the supporting evidence, there was little indication of the scope of the company's nationwide business activities. Without establishing the extent of these activities and Witcher's relationship to them as general manager, it cannot be determined whether the restriction upon Witcher was unreasonable. *See Waterfield Mortg. Co., Inc. v. O'Connor* (1977), 172 Ind.App. 673, 361 N.E.2d 924. Because the facts are not sufficiently developed to enable the court to determine the law with reasonable certainty, the summary judgment was "too blunt an instrument for resolution of the legal questions," *Waterfield*

8. Neither party attempted to consider the agreement divisible and analyze the enforceability of the paragraphs on an individual basis. *See Welcome Wagon v. Haschert* (1955), 125 Ind.App. 503, 127 N.E.2d 103.

9. The judgment was prepared by Witcher in accordance with the request of the court to prepare the findings and order.

*Mortg. Co., supra,* 361 N.E.2d at 927, in the case at hand.

The judgment of the trial court, therefore, is affirmed as to Counts I through VI and reversed and remanded, as to Count VII, for further proceedings consistent with this opinion.

HOFFMAN, P. J., concurs.

CHIPMAN, J., (by designation), concurs.