**NEAR EAST SIDE COMMUNITY ORGA-NIZATION, Jerry King, Paul Miles–Severance, Valery Delong, Dottie Tack-itt, Michelle Davis and Martha Miles–Severance, Appellants,**

v.

**Jeffery L. HAIR and Janet L. Hair, individually, and d/b/a J.L. Hair Realty, Appellees.**

No. 73A04–8903–CV–89.

Court of Appeals of Indiana, Fourth District.

June 28, 1990.

James B. Mitchell, William E. Marsh, Indianapolis, for appellants.

Craig D. Doyle, Klineman, Rose, Wolf and Wallack, Indianapolis, James Bopp, Jr., Brames, McCormick, Bopp and Abel, Terre Haute, for appellees.

MILLER, Judge.

In October 1987 the Near Eastside Multi–Service Center (NESCO), an unincorporated not for profit association, held a meeting addressing community issues of quality education and housing. The plaintiffs-appellees, Jeffrey L. Hair, Janet L. Hair, and Hair Realty (the Hairs) claimed that during that meeting the NESCO officers, Jerry King and Paul Miles–Severance, made statements about the Hairs which were defamatory because they implied the Hairs were "slum landlords". The Hairs also claimed that NESCO, its officers and members took actions which interferred with their contractual relationships with their tenants and other actions which invaded the Hairs' privacy.

The Hairs filed a complaint against NESCO, its officers and members in Shelby Circuit Court. The complaint stated three counts: (1) defamation, (2) interference with trade, and (3) invasion of privacy. NESCO filed a Motion to Dismiss under Ind. Trial Rule 12(B)(6) for failure to state a claim. The trial court denied the motion. On NESCO's motion, the Shelby Circuit Court certified the denial of the motion to dismiss for an interlocutory appeal pursuant to Ind. Appellate Rule 4(B)(6) and this court accepted jurisdiction. NESCO presents one issue for review:

Whether the trial court erred in denying the motion to dismiss because the First and Fourteenth Amendments to the Con-

stitution of the United States preclude an award of damages against NESCO and its officers for the statements and actions attributed to them by the complaint.

We affirm the trial court's decision as to Count I, defamation, and reverse as to Counts II, interference with trade, and Count III, invasion of privacy.

### FACTS

On October 25, 1987, NESCO conducted a community meeting (also referred to as Congress) at new school number 15, at 2302 Michigan Street in Indianapolis. Tours were conducted, neighborhood exhibits were displayed, entertainment was provided by the Tech High School Swing Choir, and Mayor William Hudnut gave introductory greetings. Linda Bond, Assistant to State Superintendent Dean Evans, Indiana State Department of Education, was the keynote speaker. The speakers addressed two community issues—quality education (Bond) and slum landlords (defendant Jerry King, a past officer of NESCO).

Before the October 25th meeting, NESCO distributed a handbill advertising this community meeting which stated in part:

SLUM LANDLORDS: Taking action-Starting with the "Top Three" ...

BE PART OF THE ACTION! ...

Starting with the "Top Three Slumlords," what steps will we take to protect our residents and to make sure properties are adequately maintained?

Complaint, Exhibit A. (R. 52).

There is no reference to the Hairs in Exhibit A.

NESCO also prepared an agenda for the October 25th meeting, which was available prior to the meeting, again mentioning the "Campaign on housing and slum landlords." Complaint, Exhibit B, (R. 53). There was no mention of the Hairs on this agenda. During the meeting, NESCO distributed a handbill or leaflet advertising NESCO's proposed action campaign on large landlords. This leaflet addressed an issue which NESCO perceived as a problem in its neighborhood of "housing that does not meet minimum housing and zoning standards." Complaint, Exhibit C, (R. 55). It suggested that such housing damages the near eastside neighborhood in many ways, including depressing surrounding property values, giving the community a negative image, depriving tenants of decent housing, and discouraging investment and lending in the community.

The leaflet proposed a resolution:

NESCO will work diligently to ensure that the properties of all large landlords operating in our community meet minimum legal standards (at least) at all times. NESCO will do this by; (1) working with housing and zoning code enforcement of codes as possible, or (2) developing cooperative written agreements with landlords and working together to implement them. (R. 55).

The Hairs were not named in this document.

During the course of the NESCO Congress, defendants King and Paul Miles–Severance (another past officer and representative of NESCO) allegedly made the following statements which the Hairs contend are actionable as false and defamatory:

1. Miles–Severance spoke *"to the effect that* the Hairs are large landlords who do not take care of their properties so that they comply with minimum standard housing requirements and that they are uncooperative with NESCO in dealing with alleged complaints of tenants." Complaint, paragraph 9. (R. 46). (emphasis added);

2. King "spoke about the Hairs during the NESCO congress *with the intent to create the impression* and make the Hairs appear to be large slum landlords, whose housing is not in compliance with the minimum regulatory requirements." Complaint, paragraph 10. (R. 46–47). (emphasis added);

3. King "urged the public at said congress to 'Adopt a Hair Property' for the purposes of filing complaints at the Health and Hospital Department, and of encouraging tenants to file complaints with governmental agencies so as to fur-

ther a 'more aggressive and less satisfied' attitude against the Hairs." Complaint, paragraph 10. (R. 47).

The Complaint further alleged that during the NESCO meeting, Miles–Severance and King stated that "they had never actually seen a property owned by the Hairs, or inspected a property owned by the Hairs, or were aware of any actual problems or complaints by tenants." Complaint, paragraph 15. (R. 47). Additionally, the Hairs allege that NESCO issued a document at the meeting containing the personal address of the Hairs and a list of properties they allegedly owned. Complaint, Exhibit D. (R. 57–58). This document included a Landlord Campaign Volunteer Form encouraging people to sign up to "help make the Near East Side a better place to live, work, and worship by volunteering in NESCO's campaign to ensure enforcement of housing codes for large landlords operating in our community." (R. 58). Volunteers were given an opportunity to lend their efforts to the campaign by agreeing to periodically check the exterior appearance of a Hair property, distribute informational flyers to Hair tenants, or "court watch" cases involving large landlords. (Exhibit D, R. 58).

Finally, NESCO distributed at the meeting a document which purported to be a tentative agreement (reached two days before the congress) between plaintiff Janet L. Hair and NESCO representatives. Pursuant to this purported tentative agreement:

"(1) a joint inspection of all J.L. Hair properties on the Near East Side will be done by representatives J.L. Hair and NESCO by January 31, 1988.

(2) representatives of J.L. Hair and NESCO will negotiate an agreement that will outline repairs and improvements to be done by J.L. Hair to its properties on the Near East Side. This agreement will include a time schedule for repairs.

(3) If J.L. Hair seeks financing to carry out this agreement, NESCO will support these efforts by appropriate means and will offer advise and assistance where possible.

(4) During the time that the terms of this agreement are being complied with, if NESCO receives a complaint about a J.L. Hair property it will attempt to work out an agreement with J.L. Hair on this complaint before turning the complaint over to any enforcement agency."

Complaint, Exhibit C. (R. 56).

### DECISION

For the purposes of this appeal NESCO concedes the Complaint adequately alleges each and every element of each count. Even with this assumption, NESCO urges the complaint fails to state a claim because all of the actions attributed to NESCO are insulated from liability by the First and Fourteenth Amendments of the Constitution of the United States.

■ At the outset we will review this as a Motion to Dismiss under T.R. 12(B)(6) and will look only to the allegations of the complaint as set out in the facts. *Hoosier Plastics v. Westfield Savings & Loan Association* (1982), Ind.App., 433 N.E.2d 24. Any material included in the briefs referring to depositions or other transcript references will not be considered in this review. Our scope of review on a motion under T.R. 12(B)(6) is limited to the same standard as the trial judge—the complaint should not be dismissed for failure to state a claim unless the plaintiff cannot show, under any set of facts, that he is entitled to relief. *State v. Rankin* (1973), 260 Ind. 228, 294 N.E.2d 604. The complaint should be viewed in the light most favorable to the Hairs to determine if it states a cause of action upon which relief may be granted. *Hoosier Plastics, supra.* Because NESCO concedes the Complaint adequately alleges each and every element of each cause of action, our review is then limited to the issue of a constitutional privilege and whether the trial court, in that regard, improperly denied the motion to dismiss.

### Count I—Defamation

NESCO first argues that all statements made by NESCO and its officers are absolutely protected by the constitution and are not actionable as defamation. It further

contends that because money damages can only be imposed on a speaker for false statements of fact—whether the action is styled as defamation, libel, slander, intentional infliction of emotional distress, interference with trade or invasion of privacy—that this action is properly resolved by a motion to dismiss.

The Hairs contend that NESCO's statements are false and defamatory because they imply that: (1) the Hairs are slumlords, (2) they charge exorbitant rents, (3) they do not maintain their properties according to housing and zoning regulations, and (4) they do not respond to tenant complaints. They contend that as long as the statements carry implications which are capable of defamatory interpretation, the action must survive and should properly be resolved by a jury and not by the judge. They cite *Cochran v. Indianapolis Newspapers, Inc.* (1978), 175 Ind.App. 548, 372 N.E.2d 1211. Both parties concede it is the responsibility of the court, not a jury, to draw the distinction between statements of fact and statements of opinion. *Jamerson v. Anderson Newspapers, Inc.* (1984), Ind. App., 469 N.E.2d 1243.

NESCO raises as a defense a privilege under the First Amendment. *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, left to the states the option of defining the standards of constitutional privilege for private individuals. This court has observed that defamation law seeks an accommodation between two valued societal interests: "(1) freedom of speech and of the press as it relates to well-informed community, and (2) protection of the private individual's reputation when it is involved in matters of general and public concern." *Aafco Heating and Air Conditioning Co. v. Northwest Publishing, Inc.* (1974), 162 Ind.App. 671, 678–679, 321 N.E.2d 580, 586, *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318. These interests also are represented in the Indiana Constitution:

No law shall be passed, restraining the free interchange of thought and opinion, or restrict the right to speak, or print freely on any subject whatever: but for the abuse of that right, every person shall be responsible. Article I, Section 9. All courts shall be open: and every man, for injury done to him in his person, property, or reputation shall have remedy by due course of law. Article I, Section 12.

Although our courts have never addressed the issue of a constitutional privilege in the context of a community meeting, in *Aafco* this court set forth the standard for a constitutional privilege for publication of matters which are of a general or public concern. Judge Staton, writing for the majority, observed:

Indiana's constitutional protection of freedom of expression requires that the interchange of ideas *upon all matters of "general or public interest" be unimpaired.* In order to fulfill its historic function, freedom of discussion "must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama* (1940), 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093. Emerging principles of free expression "have disclosed the artificiality, in terms of the public's interest, of a simple distinction between 'public' and 'private' individuals or institutions." *Rosenbloom v. Metromedia, Inc., supra,* 403 U.S. [29] 41, 91 S.Ct. [1811] 1818 [29 L.Ed.2d 296 (1971)]. Even the *New York Times* [*New York Times v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)] majority opinion placed primary emphasis on our *"profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."* 376 U.S. at 270–271, 84 S.Ct. at 721 (emphasis added). Comments in other United States Supreme Court decisions reiterate the basic value judgment that *constitutional guarantees of free speech and press must extend to all matters which affect our efforts to live and work together in a free society.*

We adopt a standard that requires the private individual who brings a libel action involving an event of general or

public interest to prove that the defamatory falsehood *was published with knowledge of its falsity or with reckless disregard of whether it was false.*

*Id.* at 679, 321 N.E.2d at 586. (Emphasis added).

Thus, our courts have recognized a constitutional privilege, but not an absolute one. Our analysis of this case under the standard adopted in *Aafco* is: (1) was this of a public or general interest, (2) were the actions and statements of NESCO capable of defamatory meaning, and (3) were there any allegations in the complaint which would place in issue NESCO's knowledge that the statements were false or published and distributed to the public with reckless disregard for whether they were false.

■ With regard to the first standard in *Aafco*, even though *Aafco* dealt with publications by a newspaper, we find the standard is equally applicable to a nonmedia defendant. The actions of NESCO could be compared to publishing information in a newspaper as they were publishing the information to the public of community at large. In *Henry v. Halliburton* (1985), Mo., 690 S.W.2d 775, the Missouri Supreme Court discussed the constitutional privilege in the context of the First Amendment in language which we approve and adopt:

> We do not believe that opinions lose their protected status *merely* because the declarant may be classified as a nonmedia defendant. The language in *Gertz* does not refer to media defendant;
>
> \* \* \* \* \* \*
>
> Other factors militate in favor of granting an absolute privilege for the expression of—at least some—opinions by nonmedia defendants. Aside from the difficulty inherent in defining a media defendant, it would be anomolous to hold the one who privately expresses an opinion liable but one who communicates the

same opinion to a large number of persons through the media not liable.

\* \* \* \* \* \*

Additionally, the First and Fourteenth Amendments to the Federal Constitution not only protect the freedom of the press but also embrace the freedom of speech. First Amendment protection is not lost merely because the speech involves private individuals and private communications. . . . "The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of U.S., Inc.* [466] U.S. [485], 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984).

*Id.* at 783–784 (citations omitted, emphasis in original).

Moreover, information concerning large landowners engaged in practices which tend to depreciate values in a neighborhood is of a general or public interest. *McErlean v. Harvey Area Community Organization* (1973), 9 Ill.App.3d 527, 292 N.E.2d 479.

■ Next, we must determine whether NESCO's statements were capable of defamatory meaning. NESCO cites *Rasky v. Columbia Broadcasting, Inc.* (1981), 103 Ill.App.3d 577, 59 Ill.Dec. 298, 431 N.E.2d 1055, *cert. denied*, 459 U.S. 864, 103 S.Ct. 141, 74 L.Ed.2d 120 (1982), where the court held that the term "slum lord" and "slum landlord" are subject to an innocent construction and therefore are not defamatory.[1] We do not find that case controlling because under Illinois law if a statement is capable of two constructions—one innocent and one defamatory—the rule is to favor innocent construction. Our courts, however, have the opposite rule—if a statement is capable of two meanings, one libel-

---

1. The defendant in *Rasky*, like our case, made serious charges against the manner in which the plaintiff maintained his property. He made the following statements: "He just milked the building for whatever he could get out of it"; "He never put anything into the buildings"; and he "merely pays the fines for building violations as

a cost of doing business and never bothers with repairs." *Id.* 431 N.E.2d at 1057. The plaintiff in that action brought an action for defamation, trespass, invasion of privacy, and civil conspiracy. The trial court granted defendant's motion to dismiss and the appellate court of Illinois affirmed.

ous and one not, the case should properly go to the jury. *Cochran, supra,* 175 Ind. App. at 553, 372 N.E.2d at 1217. *See also, Estill v. Hearst Publishing Company* (7th Cir.1961), 186 F.2d 1017 (applying Indiana law).

A written or oral communication is generally considered defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Cochran, supra.* Remarks which impugn a plaintiff in his trade or business are also defamatory. *Big Wheel Restaurants, Inc. v. Bronstein* (1973), 158 Ind.App. 422, 302 N.E.2d 876. *Weenig v. Wood* (1976), 169 Ind.App. 413, 349 N.E.2d 235.

NESCO urges this court to find that the statements were opinions, not statements of fact, and therefore, constitutionally protected. It is often difficult to make a distinction between protected expressions of opinion and actionable assertions of fact. Both parties cite *Ollman v. Evans* (D.C. Cir.1984), 750 F.2d 970, 979, *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985) in which Judge Starr offered a four factor guide to aid in making the distinction, which we summarize as follows:

(1) The court should analyze the common usage or meaning of the alleged defamatory statement; and (2) consider the statement's verifiability—whether the statement is capable of being objectively characterized as true or false; (3) the statement should be considered in context, in connection with other unchallenged language, and (4) in the broader context in which the statement appears.

NESCO contends that under this test, none of the statements allegedly attributed to NESCO are verifiable and the context is a public meeting where the "audience may anticipate efforts by the parties to persuade others to their position by the use of epithets, fiery rhetoric or hyperbole...." *Gregory v. McDonnell Douglas Corp.* (1976), 17 Cal.3d 596, 601, 131 Cal.Rptr. 641, 644, 552 P.2d 425, 438. In the forum of public debate, "apparent statements of fact may assume the character of state-

ments of opinion, and thus be privileged." *Information Control Corp. v. Genesis One Computer Corp.* (9th Cir.1980), 611 F.2d 781, 784.

The Hairs counter that under the *Ollman* test the statements are verifiable (for example, whether or not the Hairs do not maintain their properties). The Hairs contend that the accusations made by NESCO are false, and even in the context of a public meeting, there is no value in making false and defamatory statements which would be damaging to the reputation of another. Truth is a defense to a claim of defamation, but the defamer bears the burden of proof. *Elliott v. Roach,* Ind.App., 409 N.E.2d 661. Thus, NESCO's motion to dismiss is premature.

Under the third step of the *Aafco* analysis, we must consider whether there are any allegations which would place in issue NESCO's knowledge the statements were false or that NESCO entertained serious doubts as to the statements' falsity. *Aafco, supra,* 162 Ind.App. at 688–89, 321 N.E.2d at 591. See also *Chester v. Indianapolis Newspapers, Inc.* (1990), Ind.App., 553 N.E.2d 137 (landlord brought libel action against newspaper and reporter because of an article which portrayed landlord in unfavorable manner. Summary judgment affirmed because landlord failed to establish actual malice). The Hairs' complaint states that defendants Miles–Severance and King made the defamatory accusations "while at the same time admitting in open public that they had never actually seen a property owned by the Hairs, or inspected a property owned by the Hairs, or were aware of any actual problem or complaints by tenants." Complaint, (R. 47). Because this action comes to this court on a motion to dismiss, we must consider all allegations in the complaint as true. If the NESCO defendants are unaware of any problems with Hair property and if there is no truth to NESCO's allegations, then the Hairs may have a valid claim for relief. In *Weenig v. Wood, supra,* we noted that a qualified privilege is lost if the defendant does not

believe what he says, or if the defendant is reckless because no reason or policy "can be found for conferring immunity upon the foolish and reckless defamer who blasts an innocent reputation without making any attempt to verify his statements." *Id.* 169 Ind.App. at 438, 349 N.E.2d at 250 citing Prosser, Law of Torts (4th ed. 1971) at 795. The First Amendment does not offer absolute immunity for libelous and damaging falsehoods. *McDonald v. Smith* (1985), 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384.[2]

There is insufficient information before this court to determine whether the statements allegedly made by NESCO were false or to determine whether the NESCO defendants had any knowledge the statements were false or had doubts as to the truth of the matter. Therefore, we cannot find that NESCO's statements are protected as a matter of law and we affirm the trial court's denial of NESCO's motion to dismiss as to Count I of plaintiff's complaint.

*Count II—Interference with Trade*

 In Count II of the Complaint, as we noted earlier, the Hairs alleged that during the NESCO public forum on October 25, 1987, NESCO distributed a handbill or leaflet which proposed an action campaign on Large Landlords. On the reverse side of the leaflet the "Tentative Agreement reached 10/13/87 between Janet L. Hair and NESCO representatives" was reproduced. (R. 56). The Hairs also alleged that NESCO engaged in a concerted effort to interfere with the trade relationship the

Hairs had with their tenants by instituting a program to "Adopt a Hair Property." This program urged volunteers to look over the exterior of Hair property to report problems to NESCO and to leave flyers inviting tenants to contact the NESCO Housing Board with complaints. The Hairs assert that there is a limit to the intentional intermeddling in the business affairs of another, and when that limit is passed courts recognize the tort of interference with the contractual or business relationship. They argue NESCO exceeded this limit when they instituted the "Adopt-a–Hair Property" campaign.

Indiana recognizes the tort of interference with contractual or business relationship. *Durakool, Inc. v. Mercury Displacements Industries, Inc.* (1981), Ind.App., 422 N.E.2d 680; *Fort Wayne Cleaners and Dyers Association v. Price* (1956), 127 Ind.App. 13, 137 N.E.2d 738. The elements are:

(1) existence of a valid and enforceable contract;

(2) the defendant's knowledge of the existence of the contract;

(3) the defendant's intentional inducement of a breach of contract;

(4) the absence of justification; and

(5) damage to the plaintiff resulting from the defendant's conduct.

*Durakool, supra,* at 683.

NESCO argues that the United States Supreme Court has recognized that the First Amendment protects expression directed at business enterprises, citing

---

**2.** In *Smith* an unsuccessful candidate for appointment as a United States Attorney brought an action for libel against a citizen who sent letters to the President, members of Congress and the administration, suggesting the candidate was unfit for the position. The U.S. District Court of North Carolina denied defendant's motion for judgment on the pleadings and he appealed. The Supreme Court granted certiorari and held the First Amendment's petition clause does not provide absolute immunity for libelous and damaging falsehoods. Justice Burger, writing for the majority, observed that "the Petition Clause ... was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble ... and there is no sound basis for granting

greater constitutional protection to statements made in a petition to the President than other First Amendment expressions." *Id.* at 485, 105 S.Ct. at 2791 (citations omitted). The right to petition is guaranteed, "the right to commit libel with impunity is not." *Id.*

Justices Brennan and Blackmun in their concurring opinion noted that "[c]alculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas, and of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality....' *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031." *Id.,* 472 U.S. at 487, 105 S.Ct. at 2792.

*Thornhill v. Alabama* (1940), 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, where the court held that picketing designed to induce customers not to patronize an employer is constitutionally protected expression. *Id.* at 99, 60 S.Ct. at 742. They also cite *NAACP v. Claiborne Hardware Co.* (1982), 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215, *reh. denied,* 459 U.S. 898, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982), where the court vacated a money judgment against community activists in Port Gibson, Mississippi, who had organized an economic boycott against white merchants in the town as a protest of the racial segregation policies of the businesses.

The Hairs urge us to find that there is a triable issue—whether the actions of NESCO were justifiable. We find *Claiborne Hardware* to be controlling, which held "[w]hile states have broad power to regulate economic activity, we do not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case." *Id.* 458 U.S. at 913–914, 102 S.Ct. at 3425.

Furthermore, we observe that the cause of action for interference with contractual relationships has not been applied in the context of public interest activity in Indiana. We have reviewed cases from other jurisdictions and find that there are very few cases dealing with community or public interest groups engaging in activities that might interfere with a business and its customers. Most cases found activities similar to those engaged in by NESCO either did not fall within the definition of the cause of action of interference with trade or the actions were privileged under the First Amendment. For example, *Environmental Planning and Information Council of Western El Dorado County, Inc. v. Superior Court (Detmold Pub. Corp.),* (1984) 36 Cal.3d 188, 203 Cal.Rptr. 127, 680 P.2d 1086, a newspaper publisher brought an action against an environmental group and several of its officers for alleged interference with prospective economic advantage because of a consumer boycott of the paper's advertisers. The Supreme Court of California held that the environmental group could not be held liable for

interfering with prospective economic advantage under common law principles, construed in the light of the First Amendment, citing *Claiborne Hardware.* In making its decision the California court stated:

> Most of the cases in which claims of tortious interference have been considered have involved either pure commercial relationships or union-management relationships. There is a paucity of authority in the application of common law principles to a situation such as this, in which a group organized for political purposes allegedly undertakes a consumer boycott to achieve its ends. What authority does exist in this arena strongly suggests, even apart from constitutional doctrine, that such action will not give rise to liability. Certainly the defendants' objective—to change the editorial policies of the Foothill Times in relation to public issues affecting the environment—is a lawful one, and the means used—a peaceful secondary boycott—have likewise been held to be lawful under the common law of this state.

\* \* \* \* \* \*

Detmold would have us distinguish *Claiborne Hardware* on the basis of the objective sought by the boycott in that case. The activities of those defendants, Detmold suggests, were "clearly entitled to full First Amendment protections as the objective of their boycott was to vindicate rights of equality and freedom that lie at the heart of the Fourteenth Amendment," whereas these defendants—an "irresponsible few," according to Detmold—are seeking to further merely their private views on environmental matters, and at the expense of Detmold's own rights of free expression. Detmold's argument might have merit if this were an ordinary case of interference with advantageous economic relationships in the commercial context; for there, as we have observed, courts may be called upon to balance the social and private importance of the defendant's objective against the substantiality of the interest which plaintiff asserts. As in *Claiborne Hardware,* however, defen-

dants' activities constitute a "politically motivated boycott designed to force governmental and economic change" (458 U.S. at 914, 102 S.Ct. at 3426), and the fact that the change which they seek bears upon environmental quality rather than racial equality, can hardly support a different result. On the contrary, we are precluded by the First Amendment itself from gauging the degree of constitutional protection by the content or subject matter of the speech: *"[T]here is an 'equality of status' in the field of ideas"* (*Police Department of Chicago v. Mosley* (1972), 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212).

*Id.*, 36 Cal.3d at 194–197, 203 Cal.Rptr. at 131–133, 680 P.2d at 1091–1092 (citations and footnotes omitted). (emphasis added).

In *Searle v. Johnson* (1985), Utah, 709 P.2d 328, business owners brought an action against the Humane Society alleging intentional interference with trade. The Society had engaged in a media campaign to discourage tourists from visiting the county in order to increase public awareness of conditions at the local dog pound. Ultimately the Utah Supreme Court held that the actions of the Humane Society were privileged under the First Amendment, again citing *Claiborne Hardware.*

NESCO, like the defendants in *Claiborne Hardware, Searle* and *Environmental Planning,* was attempting to inform and persuade the public. The purpose was lawful—to encourage landlords operating in the near eastside community to meet minimum legal housing and zoning standards. The means were lawful—peaceful pamphleteering has been recognized by the Supreme Court as a form of communication protected by the First Amendment. *Organization for a Better Austin v. Keefe* (1971), 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1. In *Keefe*, the defendants were community organizers attempting to change the business practices of the plaintiff, a Chicago realtor. The *Keefe* defendants engaged in pamphleteering to force the realtor to sign an agreement that he would not engage in various real estate tactics such as blockbusting and panic peddling. Leaflets were distributed at a shopping center, in the realtor's suburban neighborhood, passed out to parishoners on the way to and from the realtor's suburban church, and left at the realtor's neighbors. The Supreme Court, in vacating an injunction against the defendants, observed:

> This Court has often recognized that the activity of peaceful pamphleteering is a form of communication protected by the First Amendment. . . .

> Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper. *See Schneider v. State, supra* [308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939)]; *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Petitioners were engaged openly and vigorously in making the public aware of respondent's real estate practices. Those practices were offensive to them, as the views and practices of petitioners are no doubt offensive to others. But so long as the means are peaceful, the communication need not meet standards of acceptability. *Id.* 402 U.S. at 419, 91 S.Ct. at 1577–78 (citations omitted).

The Hairs argue that the *Keefe* decision is distinguishable because that case dealt with an injunction. However, the *Keefe* decision did not turn on the fact that an injunction was involved, but rather on the nature of the activities restrained—peaceful pamphleteering.

Another analogous case is *McErlean v. Harvey Area Community Organization* (1973), 9 Ill.App.3d 527, 292 N.E.2d 479.[3]

---

**3.** *See also, Hofman Company v. E.I. DuPont de Nemours and Co.* (1988), 202 Cal.App.3d 390, 248 Cal.Rptr. 384, where the Court of Appeals upheld the trial court's dismissal of a developer's complaint against a chemical company and its plant managers alleging trade libel and intentional interference with prospective economic advantage; *Myers v. Plan Takoma, Inc.* (1983), D.C.App., 472 A.2d 44, where operators of a neighborhood bar sought libel action against a neighborhood association for statements made in a leaflet distributed by the association in its efforts to block the issuance of a liquor license for the bar. The Superior Court, District of Columbia, dismissed the complaint for failure to state a claim upon which relief could be

In *McErlean*, a community organization accused the plaintiff, a builder of F.H.A. subsidized homes, of "shoddy" construction. The defendants sought to enforce repairs and embarked on a campaign to publicize their grievances. They distributed handbills, which contained the plaintiff's home telephone number, accusing the plaintiff of charging inflated prices and claiming he failed to make repairs he had agreed to make. They also distributed handbills in the Harvey area and at the plaintiff's church in another town. The Illinois Court of Appeals vacated an injunction entered by the trial court because the plaintiff had not shown facts sufficient to show a likelihood of prevailing on the merits and the facts did not reveal any basis for relief under any recognized action for invasion of privacy. The court cited Prosser, Torts § 117 (4th ed. 1971). The court also found that pamphleteering was constitutionally protected activity citing *Keefe, supra.* The plaintiff attempted, as have the Hairs, to distinguish *Keefe* because it dealt with racial or equal protection issues. The Illinois court stated:

> Neither is this court persuaded by the attempt to distinguish politically, socially or racially motivated methods of expression from those involving a purely economic dispute. A community organization embarked upon a militant campaign to secure housing improvements in its area is involved in a matter of public concern.

9 Ill.App.3d 527, at 530, 292 N.E.2d 479, at 481.

Likewise, the defendants in the present case were engaged in making the public aware of the Hairs' real estate practices which were offensive to them. We find the NESCO actions, in this regard, are constitutionally protected. Therefore, we find that the activities of NESCO in Count II of plaintiffs' Complaint must be dismissed for failure to state a claim upon which relief can be granted.

## Count III—Invasion of Privacy

In Count III of the Complaint, the Hairs allege that NESCO invaded the Hairs' privacy by asserting in public that the Hairs are the biggest landlords in the near eastside—300 units, with a market value of at least $10,000 apiece—owning $3,000,000 worth of near eastside property and by circulating the Hairs' personal address with a list of properties the Hairs allegedly own. The Hairs did not claim the statements allegedly made by NESCO are either true or false.

NESCO contends that the Hairs have not stated a claim for relief under any statutory or common law authority. They argue that even if a claim might exist that the actions and statements are protected by the First Amendment citing *Organization For a Better Austin v. Keefe, supra.*

The Hairs argue that Indiana recognizes an action for invasion of privacy, citing *Indiana National Bank v. Chapman* (1985), Ind.App., 482 N.E.2d 474 and *Continental Optical Company v. Reed* (1949), 119 Ind.App. 643, 86 N.E.2d 306. The Hairs assert that the publication that the Hairs were worth "three million dollars" and the publishing of their personal address was intended to cause the Hairs mental anguish, embarassment, and exposed them to risk of criminal conduct.

Indiana recognizes the tort of invasion of privacy. In *Continental Optical Company v. Reed* (1949), 119 Ind.App. 643, 86 N.E.2d 306, this court described the cause of action as follows:

> The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with *which the public has no legitimate concern* or the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibility.

*Id.* at 648, 86 N.E. at 308 (emphasis added, citations omitted). The general tort of invasion of privacy has four distinct strands:

1) unreasonable intrusion upon the seclusion of another;

granted, and operators appealed. The Court of Appeals upheld the trial court holding the state-

ments in the leaflet were constitutionally protected statement of opinion.

2) appropriation of the other's name or likeness;

3) unreasonable publicity given to the other's private life; and

4) publicity that unreasonably places the other in a false light before the public.

Restatement (Second) Torts, § 652A(2) at 376 (1977); Prosser, Torts § 117 at 802 (4th ed. 1971). The tort is similar to defamation, but reaches different interests. Defamation reaches injury to reputation; privacy actions involve injuries to emotions and mental suffering. *Goodrich v. Waterbury Republican–American* (1982), 188 Conn. 107, 448 A.2d 1317.

█ Hence the Hairs' claim rests upon the publication that the Hairs own $3,000,-000 worth of eastside property, and the publication of their address and real estate holdings. Because they do not state in their complaint that these allegations are false, we find they have not stated a claim for false light publicity. Their claims more properly fall under the category of unreasonable intrusion on their privacy with which the public has no legitimate concern.

█ In *Keefe, supra,* which we discussed above in count II, the Keefe defendants published the plaintiff's address and home telephone number, urging persons to call the plaintiff to encourage him to change his real estate practices. Here, NESCO published only the Hairs' address, not their private home telephone number. The *Keefe* decision was cited in *McErlean v. Harvey Area Community Organization, supra.* In *McErlean,* (discussed in Count II), the plaintiff also claimed a cause of action for invasion of privacy. The Illinois court decided the plaintiff failed to allege facts which could be a cause of action for invasion of privacy. A private facts claim is actionable only if the matter publicized is of a kind that "(a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public," Restatement Torts (Second) § 652D, p. 383. In *McErlean,* the court found that "[a] community organization embarked upon a militant campaign to secure housing improvements in its area is involved in a matter of public concern." 9

Ill.App.3d at 530, 292 N.E.2d at 481. Therefore, the actions of the *McErlean* defendants were not actionable as invasion of privacy.

In the present case, even if we assume that a jury might find the NESCO statement and actions are offensive, the claim would fail because this information is a legitimate concern to the public. In *Goodrich v. Waterbury Republican–American supra,* a builder, developer of a shopping mall sued a newspaper for defamation and invasion of privacy. The newspaper published financial information and certain liens and lawsuits which had been filed against the developer. The trial court directed a verdict for the defendants. The Connecticut Supreme Court affirmed the trial court finding that the matters were of a legitimate interest to the community. Furthermore, the court noted that the liens and lawsuits were a matter of public record defeating the plaintiff's invasion of privacy claim citing *Cox Broadcasting Corporation v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328. The court found that "the plaintiff voluntarily injected himself into the public eye by engaging in an enterprise which affected the public welfare." *Goodrich,* 448 A.2d at 1331.

We observe that the names and addresses of property owners are a matter of public record. In *The Florida Star v. B.J.F.,* (1989), ── U.S. ──, 109 S.Ct. 2603, 105 L.Ed.2d 443, the Supreme Court held that publication of truthful information, lawfully obtained, may only be punishable when tailored to a state interest of the highest order.

Moreover, information regarding the number of rental units owned by a landlord in a community and the approximate value of that property is likewise a matter of community interest. As the Connecticut Supreme Court reasoned in *Goodrich,* supra:

Indeed, "[i]t is not necessary that persons actively seek publicity in order to be found in the 'public eye.'" *Adreani v. Hansen,* 80 Ill.App.3d 726, 730, 36 Ill. Dec. 259, 400 N.E.2d 679 (1980) (publicity about condemnation proceedings brought

against builders did not constitute false light invasion of privacy where proposed use of the real estate was a matter of public interest). Accordingly, the right of privacy must give way when balanced against the publication of matters of public interest, in order to insure the "uninhibited, robust and wide-open" discussion of legitimate public issues. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

448 A.2d at 1331.

Therefore, under the facts of this case, we find that Count III of plaintiffs' Complaint must be dismissed for failure to state a claim upon which relief can be granted.

For the above reasons, we affirm the decision of the trial court on Count I, defamation. We reverse with respect to Count II, interference with trade, and Count III, invasion of privacy, and remand to the trial court for proceedings consistent with this opinion.

CHEZEM, P.J., concurs.

CONOVER, J., concurs in result.