Anne NOBLES, D. William Moreau, Jr., David F. Hamilton, and the State Lottery Commission of Indiana, Appellants–Defendants,

v.

Mary L. CARTWRIGHT, Appellee–Plaintiff.

No. 49A02–9406–CV–331.

Court of Appeals of Indiana.

Dec. 21, 1995.

Henry J. Price, Jennifer L. Graham, Stephanie L. Franco, Price & Barker, Indianapolis, for Appellants.

William V. Barteau, Barteau, Berg & Buckingham, Speedway, for Appellee.

## OPINION

SULLIVAN, Judge.

Anne Nobles, D. William Moreau, Jr., David F. Hamilton, and the State Lottery Commission of Indiana (collectively referred to as Appellants) appeal the trial court's denial of full summary judgment in an action filed by Mary Cartwright (Cartwright) alleging wrongful discharge, invasion of privacy

and breach of contract. The litigation evolved from the handling of Cartwright's charges of sexual harassment against former Lottery Director Jack Crawford (Crawford). Each of the individual Appellants worked for the State of Indiana in the office of Indiana Governor Evan Bayh.[1]

Appellants present the following issues, which we restate as:

(1) whether the trial court erred in denying Appellants' motion for summary judgment upon Cartwright's wrongful discharge claim;

(2) whether the trial court erred in denying Appellants' motion for summary judgment upon the public disclosure of private facts portion of Cartwright's invasion of privacy claim;

(3) whether the trial court erred in denying Appellants' motion for summary judgment upon Cartwright's breach of contract claim.

We reverse.

A review of the facts with respect to the trial court's summary judgment disposition reveals that Cartwright began working for Crawford as an executive secretary in 1976 when Crawford was a Hammond City Court judge. In 1978, after his term as a judge expired, Crawford was elected Lake County prosecutor and Cartwright continued to work for him as an executive secretary. In September of 1980, Crawford and Cartwright began a sexual relationship.[2] In June of 1989, Governor Bayh appointed Crawford as the director of the Lottery Commission. Crawford offered Cartwright a position as the director of human resources with the Commission. Cartwright accepted the position on the condition that the sexual relationship would not continue. Nevertheless, Crawford and Cartwright resumed their affair.

On December 3, 1989, Cartwright arranged a meeting with Anne Nobles (Nobles) at Nobles' home to complain about Crawford's conduct. At that meeting, Cartwright explained the affair with Crawford and his sexual demands. Cartwright showed Nobles several documents, including an agreement written by Crawford by which he agreed not to intimidate or harass Cartwright any longer,[3] a purported will that Crawford drafted leaving Cartwright one-half of his property,[4] and assorted love letters Crawford wrote to her. After the meeting, Nobles contacted D. William Moreau (Moreau), Governor Bayh's chief of staff, and discussed Cartwright's allegations. Moreau, Nobles, and Cartwright met later that evening at Nobles' home, at which time Cartwright repeated the substance of her allegations. Cartwright expressed concern for her safety and her daughter's safety at both meetings, but did not claim that she had been threatened by anyone. Cartwright asked that her name

---

1. Anne Nobles initially served as assistant to the Governor and a liaison to the Lottery Commission. Governor Bayh subsequently appointed her deputy director of, and general counsel to, the Lottery Commission. D. William Moreau served as chief of staff for Governor Bayh. David Hamilton was legal counsel to Governor Bayh.

2. At one point, Cartwright left the prosecutor's office, citing Crawford's sexual demands as the reason for her departure. She returned to the prosecutor's office less than a year later.

3. In July of 1989, as a result of his sexual demands, Cartwright told Crawford that she planned to terminate their relationship and return to Lake County. In an effort to retain her services, Crawford drafted a document on July 15, which both he and Cartwright signed at an Indianapolis restaurant. The three page "contract" promised Cartwright a variety of benefits in exchange for a commitment from her to be "supportive and caring to Jack Crawford in all his professional endeavors." Record at 1190–91. Crawford agreed not to intimidate, harass or annoy Cartwright concerning her social activities. In addition, Crawford agreed to pay Cartwright $125 per week "support", with arrearages to accrue interest at 18.5% per year. Crawford also promised to give her half of his anticipated $10,000 bonus for beginning Lottery operations early, and to raise her salary within six months. After signing the contract, Crawford wrote Cartwright a check for $100, which she cashed. Crawford then gave Cartwright an additional $400 cash. Cartwright decided to stay with the Lottery Commission and received the promised pay raise.

4. During a business trip in 1985, Cartwright and Crawford spent the night at a Chicago hotel. While there, Crawford drafted the purported will on hotel stationery.

not be made public and that the matter be handled as discreetly as possible.

Cartwright again met with Nobles and Moreau in Moreau's office on December 5, discussing Cartwright's allegations in further detail. Cartwright showed Moreau the documents she earlier had shown Nobles. Nobles' independent investigation did not corroborate nor did it refute Cartwright's allegations. On December 8, Moreau decided to bring the matter to Governor Bayh's attention. Governor Bayh agreed that Cartwright should stay away from the office until the matter could be resolved. The Governor was aware that Cartwright had expressed concern for her safety and the safety of her daughter, and agreed to offer Cartwright state police protection.

On December 9, Nobles and an officer from the Indiana State Police went to Cartwright's apartment to convince her to go with them for a meeting, but Cartwright refused. Instead, Cartwright agreed to meet with Nobles later in the afternoon. Cartwright then went to the Indianapolis law office of Frederick R. Hovde (Hovde), whom she retained as her attorney.[5] Later that day, Hovde met with Nobles, Moreau, Hamilton, and Wayne Adams (Adams), a local attorney whom the Governor's office sought as additional counsel. At that meeting, Hovde repeated Cartwright's concern for her safety and expressed his belief that Cartwright would very much appreciate state police protection. Hovde turned over to Appellants photocopies of the documents Cartwright had earlier shown to Nobles and to Moreau on the express condition that they not be further copied or distributed and that they be submitted to the state police for a handwriting analysis.

After leaving Hovde's office, Moreau, Nobles, Hamilton, and Adams met with Governor Bayh and showed him the documents. Handwriting experts from the state police expressed the opinion that the handwriting on the documents was Crawford's. Appellants wanted Cartwright to give a sworn statement detailing her relationship with Crawford. Cartwright prepared such a statement, which included intimate details of the sexual relationship. Hovde gave the statement to Appellants on December 10. Appellants agreed that the statement would be kept confidential.

Moreau and Hamilton met with Crawford in the Governor's office on the evening of December 10. Crawford acknowledged the sexual relationship, reviewed Cartwright's sworn statement and then resigned. The next day, December 11, the Governor's office announced Crawford's resignation. Governor Bayh also announced that John Weliever would serve as the interim Lottery Director and that Nobles would be the Lottery's Deputy Director and General Counsel. Cartwright retained her job at the Lottery; Nobles was her immediate supervisor.

Crawford's resignation and speculation about what prompted it attracted immediate and widespread media attention. As early as Tuesday, December 12, various media sources began reporting that Cartwright and Crawford had an affair and that she and members of the Governor's staff had been afforded police protection.[6] The Governor's office initially refused to divulge specific details surrounding Crawford's resignation, except to say that Crawford had resigned for personal reasons. Despite mounting media and political pressure to release more information on the following day, December 13, Governor Bayh and his staff still publicly refused to confirm that Cartwright was in-

---

5. After Nobles and the officer left, Cartwright telephoned Lacy Johnson, the Lottery's security director. Johnson led Cartwright to believe that she might have reason to fear for her safety and that the state police might obtain a warrant to search her home. While Cartwright was at Hovde's office, the same police officer who had been to Cartwright's apartment earlier in the morning returned to check on Cartwright. When she received no answer at the door, she notified the apartment manager, who let the officer into Cartwright's apartment. Cartwright's adult son and teenage daughter were in the apartment. Cartwright's adult son and teenage daughter were in the apartment. Cartwright's son telephoned Cartwright at Hovde's office to inform her of the officer's actions.

6. The Governor's press secretary, Fred Nation, refused to confirm that Cartwright was involved, but he did acknowledge that Cartwright received police protection.

volved in the allegations.[7] Privately, however, Adams informed Hovde that the Governor's office intended to issue a statement explaining that Cartwright's sexual harassment charges led to Crawford's resignation. Hovde opposed the release of any such statement, but he believed that the statement would be released whether he approved or not. He believed that his only options were to let the statement be issued "as is" or to take part in editing it. Record at 1084–85. He chose to help edit. Cartwright was told of the statement and was given an opportunity to read it and to suggest changes. Governor Bayh's office released the statement on December 14. The press release acknowledged only that Cartwright had made the harassment allegations and that Crawford had resigned because of the complaints. The release did not contain any details of Cartwright's allegations. That evening, Crawford tearfully told one reporter that his relationship with Cartwright was a "love affair that went very bad." Record at 1096.

Public criticism of the Bayh administration continued to increase as media polls revealed that a majority of the people responding believed that Cartwright should have been fired. On January 4, 1990, Nobles suggested to Cartwright that she might want to tell her side of the story to the press. On the afternoon of January 6, 1990, Cartwright granted an interview to Nancy Winkley (Winkley), a reporter for the *Gary Post–Tribune*. During that interview, Cartwright told Winkley that a state police trooper had broken into her apartment on December 9 apparently looking for the documents Cartwright had shown to Nobles and Moreau. She also denied that she feared Crawford or that she ever requested state police protection. Winkley reported that Cartwright said the statement released by the Governor's office never had her final approval. The interview became the basis for a front-page story in the Sunday, January 7, 1990, edition of the *Post–Tribune*.

Cartwright then granted an interview to *The Indianapolis Star*. The *Star*'s January 8 story again reported Cartwright's assertion that a state police officer broke into her apartment. She also told a reporter for *The Indianapolis News* that she refused a ride with Nobles and an Indiana State Police trooper on December 9, saying: "'There's no way I'm going to get in a police car and go anywhere. I'm not going to find myself in a cornfield.'" Record at 1142. Cartwright also gave a radio interview, during which she steadfastly maintained that she did not request state police protection. Finally, Cartwright publicly responded to questions about a purported "contract" she and Crawford had signed on July 15. The contract was one of the documents upon which she relied to support her harassment allegations, yet she told the press that she did not take the contract seriously.

On January 10, Lottery officials terminated Cartwright's employment. The termination letter, signed by Nobles, stated in part as follows:

"Upon the instructions of Lottery Director John Weliever, I am writing to inform you that your employment with the Hoosier Lottery is terminated effective immediately.

After you came to me with allegations that you had been harassed sexually by Jack Crawford, we took your allegations seriously. I and others tried to work with you in good faith, both before and after Crawford's resignation.

In recent days, however, you have made repeated false public statements about the whole matter. These false statements have completely broken any possibility of trust between you and your supervisors, including me. The disruption of that trust and working relationship has made it impossible for you to continue at the lottery.

---

7. On December 13, *The Indianapolis News* printed a photo of Cartwright and reported that police remained outside her apartment. Cartwright acknowledged her involvement in an interview with an Indianapolis television station, reporting that the situation was not a very pleasant one, and that she was the victim of a "very, very serious matter." Record at 495. Beyond that, she refused comment except to say that she thought her phone may have been tapped. One television station reported that the Governor was participating in a "'vain attempt'" to protect Cartwright's privacy. Record at 498.

To review your false and outrageous statements:

1. You told a reporter for the Indianapolis News that you believed a State Police trooper and I might have been prepared to kill you on December 9, 1989.

2. On December 14, 1989, you met with your attorney and approved release of a statement by the Governor's Office describing the events leading to Jack Crawford's resignation. In the past several days, you have denied giving your approval and claimed the statement invaded your privacy.

3. When you spoke with Bill Moreau and me in the week of December 3, 1989, you repeatedly told us you were afraid of Jack Crawford, afraid for your safety, and you wanted protection. You have since denied any fear of Jack Crawford and said you did not want state police protection, despite your attorney's express acceptance of protection on your behalf.

4. In December you showed Bill Moreau and me the July 15, 1989, 'contract' signed by you and Crawford. Your sworn statement dated December 9, 1989, says Crawford 'wrote it because he wanted me to stay in Indianapolis and to continue to see him and to stop resisting him.' Now you are claiming the 'contract' was not 'serious.'

5. You have also made the very serious charge—without any justification and the facts to the contrary—that a State Police trooper forcibly entered your apartment in an attempt to obtain documents for the Governor's Office on December 9, 1989.

This conduct—taken individually and together—has completely undermined your ability to work effectively at the lottery. Your mistrustful attitude at the lottery and your false attacks have broken down any meaningful ability to work effectively in a key position that is critical to the success of the lottery." Record at 645–46, 1172–73.

On the same day, in an apparent attempt to demonstrate that Cartwright had indeed made the charges she later publicly denied, Appellants released copies of the documents Cartwright had given them to substantiate her claims, including Cartwright's December 10 sworn statement, Crawford's purported will, and various love letters. These documents contained some intimate details of Cartwright's sexual relationship with Crawford. Appellants also released copies of the termination letter.

Cartwright did not file any charges against Crawford, the Lottery Commission or any of the individual Appellants with the Equal Employment Opportunity Commission (EEOC) or with the Indiana Civil Rights Commission (ICRC). Instead, she filed suit against Appellants in Marion Superior Court, alleging violations of the First and Fourteenth Amendments to the United States Constitution, wrongful discharge, invasion of privacy and breach of contract. Appellants removed the case to federal court, shortly after which they filed a Motion for Summary Judgment. The federal court granted Appellants summary judgment upon Cartwright's First and Fourteenth Amendment claims, and remanded the state claims to the Marion Superior Court.

Appellants filed a motion for summary judgment and a supporting brief with the trial court regarding the remaining state claims. The trial court conducted a hearing on Appellants' summary judgment motion and subsequently granted a partial summary judgment, concluding that Moreau and Hamilton were improper defendants to Cartwright's wrongful termination claim and that no genuine issue of material fact existed with regard to the "false light" portion of Cartwright's invasion of privacy claim. The trial court denied Appellants' motion upon all remaining issues.

■■ Summary judgment is an appropriate disposition if the "designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind.Trial Rule 56(C); *e.g., Miller v. West Lafayette Community School Corp.* (1995) 2d Dist. Ind.App., 645 N.E.2d 1085, 1086, *trans. granted; Hall Brothers Construction Co. v. Mercantile Nat'l Bank of Indiana* (1994) 5th Dist. Ind.App., 642 N.E.2d 285, 286. When we review the denial

of a summary judgment, we are bound by the above standard. *City of Evansville v. Moore* (1990) Ind., 563 N.E.2d 113, 114; *Brougher Agency, Inc. v. United Home Life Ins.* (1993) 1st Dist., Ind.App., 622 N.E.2d 1013, 1016, *trans. denied.* We may consider only those matters that were designated at the summary judgment stage. T.R. 56(C), (H). *Rosi v. Business Furniture Corp.* (1993) Ind., 615 N.E.2d 431, 434; *O'Donnell v. American Employers Ins. Co.* (1993) 2d Dist. Ind.App., 622 N.E.2d 570, 572, *trans. denied.*

■ Upon appeal, the party which did not prevail in the trial court has the burden to persuade us that the trial court's decision was erroneous. *Indiana Dep't of State Revenue v. Caylor–Nickel Clinic, P.C.* (1992) Ind., 587 N.E.2d 1311, 1313; *Miller, supra,* 645 N.E.2d at 1087. We construe all facts and inferences in favor of the non-moving party, and will resolve any doubt with regard to the existence of a material issue or the reasonable inference to be drawn therefrom in favor of the non-moving party. *E.g., Cowe by Cowe v. Forum Group, Inc.* (1991) Ind., 575 N.E.2d 630, 633; *Allied Resin Corp. v. Waltz* (1991) Ind., 574 N.E.2d 913, 914.

## I. RETALIATORY DISCHARGE

### A. Claim Pursuant to Indiana Common Law

Cartwright asserts that the facts of this case give rise to a common law cause of action for retaliatory discharge. Appellants maintain that Cartwright has failed to show that a genuine issue exists for trial upon this issue. We agree.

In the body of Cartwright's brief in response to Appellants' motion for summary judgment, short citations are made to the relevant parts of the record supporting the statements made therein. However, the record does not reveal that Cartwright filed any appendix to her response brief, nor does it disclose that she attached copies of any documents supporting the assertions made. Subsequently, on the day of the summary judgment hearing, Cartwright filed a document entitled Issues of Material Fact Precluding Summary Judgment, which set forth three specific issues and citation to the record for

each. Attached to this designation were copies of the specific materials upon which Cartwright relied in her response brief. Appellants objected to the submission of these materials, but the trial court allowed Cartwright to file the documents.

■ Appellants first contend that T.R. 56(C) required Cartwright to designate those matters upon which she relied in opposing their motion at the time she filed her response, and that the trial court erred in allowing her to file specific designations on the day of the hearing. Trial Rule 56(C) requires a party to designate to the court all evidence and any other matters upon which it relies in support of, or in opposition to, a motion for summary judgment. Trial Rule 56(C) explicitly requires a party opposing summary judgment to file designations at the time he or she files the response. Thus, we must agree that filing a T.R. 56(C) designation on the day of the summary judgment hearing contravenes the rule. *Cloverleaf Apartments, Inc. v. Town of Eaton* (1994) 2d Dist. Ind.App., 641 N.E.2d 665, 667; *Keating v. Burton* (1993) 4th Dist. Ind.App., 617 N.E.2d 588, 591; *but cf. Czaja v. City of Butler* (1992) 3d Dist. Ind.App., 604 N.E.2d 9, 10 (designation requirement of T.R. 56 met through oral presentation at the hearing on the motion for summary judgment). Nevertheless, any error in accepting the late designation is harmless.

Our decisions make it clear that T.R. 56(C) is intended to aid the efficiency of summary judgment proceedings by ensuring that opposing parties, trial courts and appellate courts are not required to search the record in an effort to discern whether genuine issues of material fact exist. *See Rosi, supra,* 615 N.E.2d at 434; *J.A.W. v. Roberts* (1994) 5th Dist. Ind.App. 627 N.E.2d 802, 807–08 n. 3; *Babinchak v. Town of Chesterton* (1992) 3d Dist. Ind.App., 598 N.E.2d 1099, 1101–02, *reh'g denied.* In *Mid State Bank v. 84 Lumber Co.* (1994) 5th Dist. Ind.App., 629 N.E.2d 909, 913, we noted:

"There is no particular form a party must use in order to meet the designation requirement. It is true that the better practice for both parties is to clearly and succinctly state the material factual issues and

pertinent parts of the record relevant to those factual issues in the actual motion for summary judgment or in response to the motion. [Citation omitted] However, as long as the trial court is apprised of the specific material on which the parties rely either in support of or in opposition to the motion then the designation requirement has been met."

Accordingly, our courts have determined that a party complies with the substantive portion of the designation requirement by specifying in a summary judgment brief those portions of the record upon which it has relied. *See, e.g., Vogler v. Dominguez* (1993) 1st Dist. Ind.App., 624 N.E.2d 56, 58, *trans. denied.*[8]

Here, the late-filed designation simply repeats the allegations Cartwright first presented in her response brief, which she filed at the appropriate time. The late-filed designation states that a genuine issue of material fact exists concerning whether Appellants discharged her in retaliation for having exercised a statutorily conferred right to be free from sexual harassment. It is readily discernible that such was the issue Cartwright presented in her response brief. Also, it is clear that the documents forming the appendix attached to the designation are merely copies of the ones Cartwright earlier referenced in her response brief.[9] Accordingly, the error, if any, in accepting the late designation does not warrant reversal.

We next examine whether the materials designated present a genuine issue of material fact sufficient to preclude summary judgment. Cartwright maintains that the genuine issue precluding summary judgment is whether Appellants discharged her in re-

taliation for having exercised a statutorily conferred right to be free from sexual harassment. In support of their motion for summary judgment, Appellants pointed to the letter terminating Cartwright's employment and the absence of any charges filed with the EEOC or the ICRC. Appellants also cited the federal court's determination that Cartwright's termination was proper at least with respect to Cartwright's claims alleging a violation of her First Amendment rights. Because Cartwright did not dispute these facts in her response brief, Appellants contend that she failed to properly advance any evidence showing that a genuine issue remains for trial. Citing *Watters v. Dinn* (1994) 1st Dist. Ind.App., 633 N.E.2d 280, 285, *trans. denied,* Cartwright counters that even if the facts are not in dispute, summary judgment is inappropriate when inferences to be drawn from the facts are in dispute, and that a jury could infer from the facts that Appellants "were searching for a reason to fire Cartwright and deliberately encouraged her to give them that reason." Brief of Appellee at 18. Cartwright maintains that a jury could infer, based upon the undisputed facts that Appellants found Cartwright a "political embarrassment", that Nobles encouraged her to tell her story to the press, and that Appellants distorted her public statements. *Id.*

■ Where the facts are not in dispute, summary judgment is only inappropriate when jurors may *reasonably* draw conflicting inferences from undisputed facts. *Ayres v. Indian Heights Volunteer Fire Dep't, Inc.* (1986) Ind., 493 N.E.2d 1229, 1233; *Watters,*

---

8. Our Supreme Court has held that a party does not meet its burden on summary judgment merely by designating entire portions of the record, such as depositions. *Rosi, supra,* 615 N.E.2d at 434 n. 2.

9. Had Cartwright's late designation addressed issues not earlier discussed in her brief, Appellants' argument likely would be availing. As it is, the late designation added nothing to the response brief but copies of the documents themselves (the appendix to which the brief often refers). In some instances, this fact may be significant. For example, had Cartwright's response brief merely included appendix cites, it cannot be successfully argued that the brief's citation would be sufficient because neither the

opposing counsel nor the court would know to which documents the appendix corresponds unless the court or counsel had a copy of said appendix. Regardless, the saving grace for Cartwright here is that her brief also referenced specific pages of certain documents in addition to citing appendix tabs. An example of one of Cartwright's citations in her response brief is as follows: "(Appendix Tab No. 35, Hovde Dep. at 21, Adams Dep. at 11.)". Record at 699. It is clear to both the court and to opposing counsel that the documents upon which Cartwright relies to support that particular evidentiary allegation are Hovde's deposition at page 21 and Adams' deposition at page 11.

*supra,* 633 N.E.2d at 285; *Haase v. Brousseau* (1987) 3d Dist. Ind.App., 514 N.E.2d 1291, 1292. Cartwright was an employee at will and the Lottery's employee handbook specifically stated that employment and compensation may be terminated at any time with or without cause. The undisputed facts reveal that Cartwright made public comments which were extremely disruptive to her working relationship with Lottery officials. Specifically, she told the press that she refused a ride with a state police officer and a member of the Governor's staff (later identified as Nobles) on December 9, 1989, because she didn't want to find herself in a cornfield. That statement could carry the implication that the Governor's office, the state police, and/or Nobles, who by then was her immediate supervisor at the Lottery, might have been prepared to cause her great harm. Cartwright also publicly maintained that the Governor's December 14 press release was issued without her approval when in fact her attorney helped to edit it and she reviewed it before its release. Further, Cartwright claimed that she never requested state police protection and that a state trooper had broken into her apartment on December 9, 1989.

The gravamen of Cartwright's claim is that the Lottery Commission's proffered reasons for her dismissal are merely pretextual. That strategy requires a jury to infer, given the undisputed facts, that Cartwright was "really" fired for complaining about Crawford's conduct and not because of the reasons the Commission put forth.

In light of the above facts, even applying a liberal construction in favor of Cartwright, such an inference is unreasonable as a matter of law.[10] We therefore conclude that the trial court erred in denying Appellants' motion for summary judgment with respect to the common law retaliatory discharge claim.

## B. Claim Pursuant to I.C. 4–15–10

■ The trial court determined that Cartwright may maintain a cause of action based upon the theory that she was discharged in retaliation for acts taken under I.C. 4–15–10 (Burns Code Ed.Repl.1990). However, the provisions of I.C. 4–15–10 do not appear to apply to Cartwright. Indiana Code 4–15–10 provides remedies for state employees whose rights are violated by a state agency. Specifically, I.C. 4–15–10–5 provides that no employee of a state agency shall suffer a penalty or the threat of a penalty because he or she exercised rights pursuant to I.C. 4–15–10. For the purposes of I.C. 4–15–10 protection, any person, except an elected official, who works for an agency is an "employee". I.C. 4–15–10–1. Indiana Code 4–15–10–1 defines agency as "any state administration, agency, authority, board, bureau, commission, committee, council, department, division, institution, office, service, or other similar body of state government created or established by law." Thus, if Cartwright was an employee of an agency while serving as human resources director with the Lottery Commission, 4–15–10 would provide a suitable avenue for relief. However, I.C. 4–30–3–1 (Burns Code Ed.Repl.1990), the statute creating the Lottery Commission, specifically states that "[t]here is created a state lottery commission as a body politic and corporate separate from the state" and Lottery Commission employees are not state merit system employees under I.C. 4–15–2 (Burns Code Ed.Repl.1990 & Supp.1995). The Indiana Administrative Code reiterates the fact that those who work for the Lottery are not employees of the state of Indiana. Ind.Admin.Code tit. 65, r. 1–3–1 (1992).

**10.** The decision we reach is similar to one reached earlier upon Appellants' motion for summary judgment at the federal level. Counts I and II of Cartwright's five count complaint involved federal constitutional questions. After Appellants removed this case to federal court, Judge S. Hugh Dillin granted Appellants' motion for summary judgment with regard to Count I of Cartwright's complaint, which alleged that Appellants violated her First Amendment right to free speech by firing her for statements she made to the press. In so doing, the federal court engaged in a balancing of interests to determine whether a public employee's statements on a topic of public concern are protected under the First Amendment. *See, e.g., Biggs v. Village of Dupo* (1990) 7th Cir., 892 F.2d 1298, 1303–04. The federal court determined as a matter of law that the Lottery did not violate Cartwright's First Amendment right to free speech, and, in effect, was justified in firing her because her statements were "highly disruptive of the working atmosphere at the Lottery." Record at 48.

Furthermore, Cartwright failed to process an appeal of the disciplinary action under the procedure set forth in I.C. 4–15–2–34 and –35.

Even if we were to assume that the provisions of I.C. 4–15–10 apply to Cartwright, it would be unreasonable as a matter of law for a trier of fact to infer that Cartwright was fired in retaliation for reporting Crawford's actions under I.C. 4–15–10, and not for the reasons outlined in her termination letter. The trial court erred insofar as its decision implies that Cartwright may pursue a retaliatory discharge claim pursuant to the authority of I.C. 4–15–10.[11]

## II. INVASION OF PRIVACY

Cartwright maintains that Appellants' release of the documents she provided them to substantiate her claims against Crawford gave unreasonable publicity to intimate details of her private life.[12] Appellants argue that Cartwright's invasion of privacy claim must fail because the very nature of the events in this case make all the intimate details of Cartwright's sexual harassment claim a legitimate concern to the public. Appellants also contend that Cartwright's statements to the press serve to waive any right she may have to proceed upon her invasion of privacy claim. Thus, they conclude that the trial court erred when it denied their motion for summary judgment upon the invasion of privacy issue. We agree.[13]

■■ Indiana recognizes the tort of public disclosure of private facts. *Watters, supra*, 633 N.E.2d 280, 290; *Near East Side Community Org. v. Hair* (1990) 4th Dist. Ind.App., 555 N.E.2d 1324, 1334; *Continental Optical Co. v. Reed* (1949) 119 Ind.App. 643, 648, 86 N.E.2d 306, 308, *reh'g denied.* A public disclosure claim is one of four theories cognizable under the rubric of invasion of privacy.[14] In Indiana, an invasion of privacy by public disclosure of private facts claim requires proof of the following essential elements: (1) A public disclosure [15] of private

11. Our disposition of this case with regard to Cartwright's wrongful discharge claim necessarily means that we do not reach some of Appellants' alternative arguments. Specifically, we need not address the related questions of whether Cartwright could have pursued her retaliatory discharge claim under Indiana common law, nor whether Title VII or the Indiana Civil Rights Act provide Cartwright with an exclusive remedy in that area. We also do not address the preclusive effect of Judge Dillin's federal decision. In addition, we do not address the merits of Appellants' assertion that the Lottery Commission is entitled to discretionary immunity for its decision to fire Cartwright.

12. Cartwright also argued to the trial court that Appellants' release of her termination letter unreasonably placed her in a false light with the public. The trial court, however, granted Appellants summary judgment upon that claim. The termination letter does not contain the kind of personal or intimate details as does the sworn statement she submitted to Appellants on December 10 and the other various documents Cartwright showed Appellants to substantiate her harassment claims. Our focus here is upon the Appellants' release of Cartwright's statement and its accompanying personal documents.

13. Appellants also argue that discretionary immunity renders them immune from an invasion of privacy claim and, alternatively, that Cartwright has waived her right to pursue such a claim because of her public statements regarding the Crawford resignation and the investigation of

her sexual harassment allegations. Because we determine that the trial court erred in denying summary judgment given the fact that Cartwright's invasion of privacy claim does not present a material issue of fact for the jury, we need not address either of these arguments.

14. According to the Restatement (Second) of Torts, an invasion of privacy claim encompasses four separate and distinct causes of action:

(1) unreasonable intrusion upon the seclusion of another;

(2) appropriation of another's name or likeness;

(3) unreasonable publicity given to the another's private life;

(4) publicity that unreasonably places another in a false light before the public.

*See* Restatement (Second) of Torts § 652A (1977); W. Page Keeton et al, *Prosser and Keeton on the Law of Torts* § 117 (5th ed. 1984).

15. The Restatement (Second) of Torts, § 652D, cmt. a (1977), notes that publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." In *Doe v. Methodist Hosp.* (1994) 1st Dist. Ind.App., 639 N.E.2d 683, *reh'g denied,* a panel of this court disagreed about the number of persons to whom the offensive information must be divulged to satisfy this element. Judge Robertson, who was joined in the majority by Judge Ratliff,

information concerning the plaintiff[16] that would be highly offensive and objectionable to a reasonable person of ordinary sensibilities;[17] (2) to persons who have no legitimate interest in the information;[18] (3) in a manner that is coercive and oppressive.[19] *Watters, supra* at 290; *see also* Restatement (Second) of Torts § 652D (1977); J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 1.5[B], § 5.9 (1987 & 1995); David A. Elder, *The Law of Privacy* §§ 3:3 to 3:7 (Law. Co-op 1991). Each element of the claim must be proved. Thus, even if we assume that a trier of fact might find that the information disclosed was offensive to a reasonable person and that the manner in which it was disclosed was coercive and oppressive, a claimant may not recover if the information disclosed is of legitimate public interest. *See Hair, supra* at 1335.

The instant case focuses upon the "legitimate public interest" element, i.e., whether the information contained in Cartwright's sworn statement and its accompanying documents were matters of legitimate public concern. The trial court's written entry discloses that neither party disputed that the "events surrounding" Cartwright's allegations were of legitimate public concern.

Cartwright's position is that the intimate and sexual nature of the information contained in the statement disclosed by Appellants rendered it too private to be considered of legitimate public interest. In effect, Cartwright maintains that the disclosure of such facts added nothing to already newsworthy "events." The trial court tried to strike some kind of balance between the public's right to know and Cartwright's right to privacy, concluding that a jury question existed regarding whether the release of private facts about the plaintiff was so offensive as to outweigh any legitimate interest that the public might have in the release of the information.

Appellants maintain that the trial court's ruling erroneously establishes a new balancing test, one which would allow imposition of liability for disclosure of facts of undisputed public concern. Such an argument, however, presupposes that the information released by Appellants was indisputably of public concern. Conceding that the "events surrounding" Cartwright's allegations of sexual harassment were of legitimate public concern does not by proxy render of legitimate public concern all information somehow connected

cited favorably the above language from the Restatement. *Doe, supra*, (Najam, J., dissenting) 639 N.E.2d at 685. Judge Najam dissented, arguing that the degree of publicity required is a question properly for the trier of fact. 639 N.E.2d at 686.

**16.** If facts are already known to many people, such facts are not considered "private" and no liability will accrue for their disclosure. Restatement (Second) of Torts § 652D, cmts. a, b (1977); J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 5.9[C][2] (1987 & 1995). Neither the disclosure of facts contained in public records, nor facts relating to a plaintiff's public activities are an unpermitted disclosure of "private" facts. *Id.* Moreover, the general rule is that republication of a matter already made public by another is not the disclosure of private facts. *Id.* In *Hair, supra*, 555 N.E.2d at 1335, the disclosure of the names and addresses of alleged "slumlords" was not an invasion of privacy because the names and addresses of property owners are matters of public record.

**17.** The facts disclosed must be embarrassing to an ordinary person. "The law of privacy is not intended for the protection of any shrinking soul who is abnormally sensitive about such publici-

ty." William Prosser, *Privacy*, 48 Cal.L.Rev. 383, 397 (1960); McCarthy, *supra* § 5.9[A][2].

**18.** Many courts use the terms "newsworthy" and "of legitimate public interest" interchangeably. A least one commentator, however, has noted that "the definition of what is newsworthy—containing that 'indefinable quality of information that arouses the public's interest and attention'—is, in some respects, somewhat broader than the exceedingly difficult to define notion of what is of legitimate concern to the public." *See* David A. Elder, *The Law of Privacy* § 3:12 (Law. Co-op 1991) (footnotes omitted).

**19.** The Restatement does not address whether the defendant's culpability, fault, or state of mind is an issue or element. The coercive and oppressive manner requirement under the Indiana definition, however, could be interpreted to refer merely to the objective circumstances surrounding the disclosure, as opposed to any culpable state of mind on the part of the discloser. Be that as it may, at least one commentator has opined that any element of defendant's culpability is subsumed within the twin elements of "highly offensive to a reasonable person" and matters not of "legitimate public concern." *Elder, supra*, § 3.6.

to those events. As hereinafter discussed, it is conceivable that even though a matter is of legitimate public concern, there may be details about a person involved in that matter which are too private to also be considered of legitimate public concern. Thus, we agree with the trial court's decision to the extent that it attempts to articulate such a position. Nevertheless, we conclude that the trial court erred in determining that the trier of fact could decide whether the information disclosed by Appellants was of legitimate interest to the public.

■■■ Indiana cases have yet to discuss in any significant detail the "legitimate public interest" element of the public disclosure tort. Our research reveals that in many public disclosure of private facts cases, courts decide whether the First Amendment to the U.S. Constitution affords a privilege which protects publication or disclosure of the information at issue. *E.g., Gilbert v. Medical Economics Co.* (1981) 10th Cir., 665 F.2d 305, 307; *Campbell v. Seabury Press* (1980) 5th Cir., 614 F.2d 395, 397; *Dresbach v. Doubleday & Co.* (1981) D.D.C., 518 F.Supp. 1285, 1288–91; *Anonsen v. Donahue* (1993) Tex.Ct. App., 857 S.W.2d 700, 703–04, *cert. denied* (1994) — U.S. —, 114 S.Ct. 2135, 128 L.Ed.2d 865; *Vassiliades v. Garfinckel's, Brooks Bros.* (1985) D.C., 492 A.2d 580, 589; *Crump v. Beckley Newspapers, Inc.* (1983) 173 W.Va. 699, 320 S.E.2d 70, 83–84. If a matter is determined to be of legitimate public interest, the disclosure or publication of information about that matter is said to be privileged under the First Amendment.[20] *See Gilbert, supra; Campbell, supra.* In the instant case, however, we are not called upon to determine the extent to which the First Amendment protects the disclosure.[21] Rath-

er, we must decide whether the information contained in Cartwright's statement is a matter of legitimate public interest under Indiana's common law tort of public disclosure of private facts. We confine our discussion accordingly; if the facts disclosed in Cartwright's statement are indisputably matters of legitimate public interest, Cartwright's claim must fail as a matter of law. Conversely, if reasonable minds could differ with regard to that issue, it is one for the trier of fact.

■■■ Once a matter is found to be within the sphere of public interest, otherwise private facts about a person may also be considered of legitimate public interest if those particular facts are sufficiently related to the matter that is of legitimate public concern. Restatement (Second) of Torts § 652D, cmts f, h (1977). *See also, Cinel v. Connick* (1994) 5th Cir., 15 F.3d 1338, *cert. denied* (1994) — U.S. —, 115 S.Ct. 189, 130 L.Ed.2d 122; *Lee v. Calhoun* (1991) 10th Cir., 948 F.2d 1162, 1166, *cert. denied* (1992) 504 U.S. 973, 112 S.Ct. 2940, 119 L.Ed.2d 565; *Ross v. Midwest Communications, Inc.* (1989) 5th Cir., 870 F.2d 271, 273, *cert. denied* (1989) 493 U.S. 935, 110 S.Ct. 326, 107 L.Ed.2d 316; *Gilbert, supra,* 665 F.2d 305; *Campbell, supra,* 614 F.2d at 397; *Dresbach, supra,* 518 F.Supp. at 1290; *Vassiliades, supra,* 492 A.2d at 590; *Romaine v. Kallinger* (1988) 109 N.J. 282, 537 A.2d 284, 294. In such instance, no liability will accrue for their disclosure or publication. Thus, it is said that the public's legitimate interest in the individual to some reasonable extent includes publicity given to facts about the individual which would otherwise be purely private. Restatement (Second) of Torts § 652D, cmts. f, h (1977);[22] *see also Gilbert, supra,* 665

---

20. We note that those cases in which courts have concluded that a "First Amendment privilege" applies do so only after first determining, as we must here under Indiana law, that the disclosure concerns a matter of legitimate public concern.

21. Appellants have not mounted a defense based upon the First Amendment privilege. Appellants' position is that the material they disclosed was of legitimate public interest as a matter of Indiana common law. Appellants do not implicate the First Amendment except to recognize in a footnote that it is "unconstitutional to impose liability for disclosure of facts, though offensive,

where those facts relate to a matter of legitimate public interest." Brief of Appellants at 44.

22. The Restatement includes within the scope of legitimate public concern those matters which are customarily regarded as "news," but its standard is vague and imprecise:

"Permissible publicity to information concerning either voluntary or involuntary public figures is not limited to the particular events that arouse the interest of the public. That interest, once aroused by the event, may legitimately extend, to some reasonable degree, to further

F.2d at 308; *Virgil v. Time, Inc.* (1975) 9th Cir., 527 F.2d 1122, 1131, *cert. denied* (1976) 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823; McCarthy, *supra* § 5.9[B][1]; Elder, *supra* § 3:11. This is true even when the information relates to a person who has neither sought nor consented to the publicity, but nevertheless has become a person about whom there is public interest because of his or her involvement in an occurrence or an event that is of legitimate public concern. *Campbell, supra,* 614 F.2d at 397; *Romaine, supra,* 537 A.2d at 294; *see also Haynes v. Alfred A. Knopf, Inc.* (1993) 7th Cir., 8 F.3d 1222, 1232 ("People who do not desire the limelight and do not deliberately choose a way of life or course of conduct calculated to thrust them into it nevertheless have no legal right to extinguish it if the experiences that have befallen them are newsworthy, even if they would prefer that those experiences be kept private."). The Restatement refers to such persons as involuntary public figures. Restatement (Second) of Torts § 652D, cmt. f (1977). In the instant case, it is at least arguable that Cartwright voluntarily sought publicity by publicly commenting upon the events which occurred after she first reported the harassment.[23] Nevertheless, we need not reach such a conclusion because at the very least, Cartwright was an involuntary public figure and the two are treated the same for purposes of an argument such as that made by Cartwright. The fact that a person has become a public figure, voluntarily or involuntarily, does not thereby render every aspect of his or her life subject to public scrutiny. "Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close personal friends." Restatement (Second) of Torts, § 652D, cmt. b (1977); *see also Virgil, supra,* 527 F.2d at 1131; *Vassiliades, supra,* 492 A.2d at 589; *Crump, supra,* 320 S.E.2d at 84; Elder, *supra* § 3:11; McCarthy, *supra* § 5.9[B][1].

When dealing with the disclosure of such allegedly "private" fact about a plaintiff, courts generally require an appropriate nexus or some sufficient degree of relatedness between the fact or information disclosed and a matter which was at the time of the disclosure "newsworthy" or of legitimate public interest. *E.g., Cinel, supra,* 15 F.3d at 1346 (because materials broadcast by defendants were "substantially" and "directly" related to an already newsworthy story about plaintiff, no liability accrued for their disclosure); *Lee, supra,* 948 F.2d at 1166 (doctor's disclosure of facts about plaintiff "were 'sufficiently related' to the news story to preclude them from serving as the basis for an invasion of privacy claim"); *Ross, supra,* 870 F.2d at 273 (test as a matter of law was whether details of a rape were *relevant* to accused's innocence, which was a matter of legitimate public concern); *Gilbert, supra,* 665 F.2d at 308

---

information concerning the individual and to facts about him, which are not public and which, in the case of one who had not become a public figure, would be regarded as an invasion of his purely private life.

\* \* \* \* \* \*

In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational .prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern. The limitations, in other words, are those of common decency, having due regard to the freedom of the press and its reasonable leeway to choose what it will tell the public, but also due regard to the feelings of the individual and the harm that will be done

to him by the exposure. Some reasonable proportion is also to be maintained between the event or activity that makes the individual a public figure and the private facts to which publicity is given." Restatement (Second) of Torts § 652D, cmt. h (1977).

**23.** Some persons voluntarily place themselves in the public eye, such as celebrities and politicians. Such voluntary public figures retain less privacy than others at least with regard to the legitimate reporting of facts reasonably relevant to their public activities. McCarthy, *supra* § 5.9[B]; Elder, *supra* § 3.11. Likewise, decisions uniformly have held that a public official's comments or actions either in his official capacity or when relating to his fitness for office are matters of great public interest. Elder, *supra* § 3:11; *see, e.g., Briscoe v. Reader's Digest Ass'n* (1971) 4 Cal.3d 529, 483 P.2d 34, 93 Cal.Rptr. 866, *reh'g denied.*

(there was "substantial relevance" between the disclosed information and newsworthy theme of a particular publication); *Campbell, supra,* 614 F.2d at 397 (a "logical nexus" existed between disclosure and a matter of legitimate public concern); *Vassiliades, supra,* 492 A.2d at 590 (recognizing the " 'logical nexus' " test as appropriate). Under such a test, if there exists an appropriate nexus between the information and a story that is already "newsworthy," then the fact is also of legitimate public interest, no matter how sensitive or how private. Whether such a nexus exists depends largely upon how closely related the particular fact disclosed is to the newsworthy event.

■ We apply the above analysis here.[24] Accordingly, under the "legitimate public interest" element of Indiana's public disclosure tort, the information contained in Cartwright's statement is of legitimate public interest only if it was substantially relevant and closely related to a matter or an event which was of legitimate public interest. Crawford's alleged sexual harassment and the manner in which the Bayh administration handled the investigation into the harassment allegations were no doubt matters of legitimate public interest. Also of legitimate public interest is misconduct of public officials. We also recognize that the public has a legitimate interest in sexual harassment in the workplace and those actions which constitute such intolerable behavior. All of these matters were of legitimate public interest when Appellants released Cartwright's statement and its accompanying documents. In our view, the information Appellants disclosed is both substantially relevant and closely related to the general topic of Crawford's alleged sexual harassment and the ensuing furor over his resignation. Thus, we are satisfied that there exists an appropriate nexus between the information disclosed about Cartwright and a matter that was newsworthy at the time of the disclosure.

We are aware the disclosure of sexual and other such intimate information about even the most public of figures is often not considered newsworthy because it usually has nothing to do with that person's public life, and thus may not be considered of any *legitimate* concern to the public. Likewise, where involuntary public figures are involved, information of a sexual or intimate nature usually is unrelated to the general topic legitimately within the public's interest. This case presents a unique situation, however, because Cartwright has become a person of public interest due to her harassment allegations against Crawford and her subsequent public pronouncements regarding the Bayh administration's handling of the entire situation. The allegations themselves necessarily involved intimate and sexually explicit episodes. In our view, the details of the extramarital affair are indeed relevant to the general subject of sexual harassment, which is undoubtedly a topic of legitimate public interest, because they illustrate the type and extent of conduct constituting sexual harassment. Furthermore, the details of the affair relate to the conduct of the Director of the Indiana Lottery Commission, whose fitness for that office is also a matter of legitimate public concern.

■ Where the trial court has incorrectly applied law to undisputed facts in ruling upon a motion for summary judgment, we will reverse its ruling upon appeal. *Whiteco Industries, Inc. v. Nickolick* (1991) 1st Dist. Ind.App., 571 N.E.2d 1337, *trans. denied.* In this case the trial court erroneously determined that, given the facts of the instant case, a trier of fact must determine whether the information disclosed was of legitimate public interest. While we recognize that in certain public disclosure cases, it may be necessary to defer to the fact-finding process to gain a result which is fair and representa-

---

24. In applying the "appropriate nexus" test, we decline to adopt a standard or a test which would require our courts to weigh specific factors in determining whether a particular fact is of legitimate public interest. California courts have embraced a test that weighs three factors in making such a "newsworthiness" evaluation: (1) the social value of the facts published; (2) the

depth of the disclosure's intrusion into ostensibly private affairs; and (3) the extent to which the party voluntarily acceded to a position of public notoriety. *See, e.g., Briscoe, supra,* 483 P.2d at 42, 93 Cal.Rptr. at 875; *Wasser v. San Diego Union* (1987) 191 Cal.App.3d 1455, 236 Cal.Rptr. 772, 776; *Diaz v. Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 188 Cal.Rptr. 762, 772.

tive of the attitudes of the community, this is not such an instance.[25] When the undisputed evidence leads to the conclusion that no reasonable trier of fact could find for the plaintiff, summary judgment for the defendant is appropriate as a matter of law. Based upon the facts presented here, no reasonable juror could determine that the information contained in Cartwright's statement and disclosed by Appellants is not both substantially relevant and closely related to Crawford's alleged sexual harassment and the ensuing investigation into his resignation, which was, at the time of the disclosure, a matter of legitimate public interest. Accordingly, Cartwright does not present a genuine issue of material fact with regard to the "legitimate public interest" element. The trial court erred in denying Appellants summary judgment upon this issue.

### III. BREACH OF CONTRACT

◼ Cartwright contends that "on or about December 10, 1989, Cartwright agreed to provide certain documents signed by Crawford and a statement signed by her ... in exchange for the Defendants' promise not to make public the contents of such documents." Record at 25. It is Cartwright's position that the promise was binding upon the Lottery Commission. The trial court denied Appellants' motion for summary judgment upon this issue, determining that genuine issues of material fact exist "regarding the relationship of all parties at the time the agreement was entered, the scope of any agency that may have existed, and the effect of any waiver by acts of [Cartwright]." Record at 1304. Upon appeal, Appellants argue

that Nobles, Moreau, and Hamilton were each state employees who did not possess the requisite authority to bind the Lottery Commission to any contract on December 10, 1989. Appellants further maintain that Nobles, Moreau, and Hamilton cannot be individually liable pursuant to the purported contract because they did not specifically consent to personal liability in writing. We agree with Appellants.

Cartwright first counters that Appellants have waived any contention that Nobles, Moreau, and Hamilton cannot bind the Lottery Commission because they were acting solely within the scope of their employment in the Governor's office. While it is true that Appellants did not make exactly the same argument to the trial court as made now, Appellants did contend that they were not liable because government employees are not personally liable upon contracts entered into within the scope of their employment for a governmental entity unless clearly otherwise indicated in writing. The clear implication of such an argument is that on December 10, 1989, Nobles, Moreau, and Hamilton were all acting solely as employees of the Governor's office and, as a consequence, could not bind the Lottery Commission. Accordingly, and because we prefer to adjudicate a claim upon its merits,[26] we conclude that Appellants sufficiently presented this issue to the trial court to preserve their argument for appeal.

It is undisputed that on December 10, 1989, Nobles was a member of Governor Bayh's staff, serving as a liaison to the Lottery. It is also undisputed that Moreau was Governor Bayh's chief of staff and that Hamilton was counsel to the Governor. As such,

25. Courts do not hesitate to decide whether a matter is of public concern as a question of law if the particular facts and circumstances of a given case so warrant. *See Cinel, supra,* 15 F.3d at 1346; *Gilbert, supra,* 665 F.2d at 309; *Rosanova v. Playboy Enters. Inc.* (1976) S.D.Ga., 411 F.Supp. 440, 444, *aff'd* (1978) 5th Cir., 580 F.2d 859; *Anonsen, supra,* 857 S.W.2d at 704; *Walker v. Colorado Springs Sun, Inc.* (1975) 188 Colo. 86, 538 P.2d 450, *cert. denied* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399. *See also Anderson v. Fisher Broadcasting Cos.* (1986) 300 Or. 452, 712 P.2d 803, 809 ("The editorial judgment of what is 'newsworthy' is not so readily submitted to the *ad hoc* review of a jury.... It is not properly a community standard."). In our view, it is inap-

propriate to adopt any type of analysis which would make virtually every public disclosure case a jury question on the issue of legitimate public concern. At the same time, we stress that courts should not foreclose a trier of fact from determining the legitimacy of public concern in an appropriate public disclosure case. Indeed, had the information disclosed in the instant case not been so closely related to the harassment itself, we would not be willing to conclude as a matter of law that the information disclosed is a matter within the public's legitimate interest.

26. *See, e.g., Town of Rome City v. King* (1983) 3d Dist. Ind.App., 450 N.E.2d 72, 76.

they were employees of the State of Indiana. As a consequence, each of them had an interest in allegations of wrongful conduct against Crawford, a person who served at the pleasure of the Governor. Each of them had a duty in the scope of their employment to obtain information and to relay relevant and pertinent information to the Governor so that the Governor could make the appropriate decision regarding Crawford's continued service as Lottery Director.

Indiana Code 34–4–16.6–1(a) (Burns Code Ed.Repl.1986) provides that a "present or former public employee ... is not personally liable on contracts entered into within the scope of his employment for a governmental entity ... unless it is clearly otherwise indicated in writing." Here, there are no facts in dispute, nor are there inferences reasonably to be drawn from the undisputed facts which would lead a trier of fact to conclude that Nobles, Moreau, or Hamilton were not state employees who were acting within the scope of their employment on December 10, 1989 when they agreed to keep the matter confidential. The confidentiality contract Cartwright alleges here is an oral one and the undisputed facts reveal that Nobles, Moreau, and Hamilton did not specifically agree in writing to assume any personal liability. As such, none of them are bound personally by the alleged agreement.[27] The trial court erred when it determined that genuine issues of material fact precluded summary judgment with respect to Nobles', Moreau's, and Hamilton's individual liability on the contract.

Appellants also contend that the Lottery Commission is not bound by the purported contract because, as employees of the Governor's office, neither Nobles, Moreau, nor Hamilton had the authority to enter into any kind of a contract on December 10, 1989 on behalf of the Lottery Commission. We agree.

Those who work for the Lottery Commission, even officers, serve at the discretion of the director and are subject to suspension, dismissal, reduction in pay, demotion, transfer, or other personnel action at the discretion of the director. I.C. 4–30–3–14 (Burns Code Ed.Repl.1990); Ind.Admin.Code tit. 65, rs. 1–3–1 & 1–1–11 (1992). We find no provision in either Indiana's administrative code or its statutes which grants Nobles, Moreau, or Hamilton, as employees of the Governor's office, the power to make binding agreements regarding personnel matters at the Lottery Commission. However, because we find no such authority does not mean that they could not bind the Lottery Commission under an agency theory.

Clearly, the Lottery Director has the authority to enter into contracts upon the Lottery Commission's behalf. *See* Indiana Admin.Code tit. 65, r. 1–1–9 (1992). The Director, however, is not the only person who may make a binding promise to another with regard to employment at the Lottery Commission. General principles of agency law provide that any person who has either actual or apparent authority may do so. Certainly, the Director is free to grant specific authority to another to make certain personnel decisions, or to ratify the decision another has made. In such instances, the person so empowered is said to have possessed actual authority to make personnel decisions. The record reveals no evidence that Nobles, Moreau, or Hamilton had been granted specific authority on or before December 10 to make such a person-

---

**27.** Cartwright also makes some reference in her brief to the idea that Nobles, Moreau, and Hamilton should incur personal liability for allegedly promising Cartwright that she could retain her position as Human Resource Director of the Lottery as part of their efforts to obtain the documents at issue. Br. of Appellee at 40–41. We note initially that the bulk of Cartwright's argument on the contract issue is devoted to the assertion that the individual defendants were in fact acting on behalf of the Lottery Commission, an argument which we reject, *see infra* Op. at 1079–1080. Further, Cartwright presents no argument to dissuade us from the conclusion that Cartwright's firing was justified by her actions taken with respect to the press, *see supra* Op. at 1071–1073. Thus, even if we were to make the assumption which Cartwright invites but for which she does not present cogent argument, *i.e.*, that Cartwright's status as an employee at will was altered by promises made by the individual defendants, we would conclude that no liability could attach to anyone for Cartwright's termination, because good cause existed therefor. *Cf. Swan v. TRW, Inc.* (1994) 5th Dist. Ind.App., 634 N.E.2d 794, 796–97 (employer may terminate a contractual employee for good cause without incurring liability).

nel decision by anyone at the Lottery Commission, and certainly not by Crawford. The only other plausible agency theory involves apparent authority.

■ Apparent authority is the authority which a third person reasonably believes a purported agent to possess, when in fact the purported agent has no such actual authority. *See, e.g., Pepkowski v. Life of Indiana Ins. Co.* (1989) Ind., 535 N.E.2d 1164, 1166; *Bain v. Board of Trustees of Starke Mem. Hosp.* (1990) 3d Dist. Ind.App., 550 N.E.2d 106, 109, *reh'g denied; Grosam v. Laborers' Int'l Union of North America, Local 41* (1986) 3d Dist. Ind.App., 489 N.E.2d 656, 658, *trans. denied; Warner v. Riddell Nat'l Bank* (1985) 1st Dist. Ind.App., 482 N.E.2d 772, 775, *trans. denied.* In the instant case, it is not illogical for Cartwright to have assumed that those making promises concerning confidentiality and/or continued employment would not do so unless they could effectuate the promises. Thus, one may begin to understand how Cartwright might have developed the impression that either Nobles, Moreau, or Hamilton, or perhaps all of them, had some kind of authority to act upon behalf of the Lottery Commission. Regardless, Indiana law requires that to establish an apparent authority, it is essential that there be some form of communication, direct or indirect, by the principal which instills a reasonable belief of the agent's authority in the mind of the third party. *Pepkowski, supra* at 1167; *see also State Farm Mut. Auto. Ins. Co. v. Gonterman* (1994) 1st Dist. Ind.App., 637 N.E.2d 811, 815; *Jarvis Drilling v. Midwest Oil Producing Co.* (1993) 4th Dist. Ind. App., 626 N.E.2d 821, 826, *trans. denied.* Statements, manifestations, or bald assertions made by the purported agent are, by themselves, insufficient to create an apparent agency relationship. *Pepkowski, supra* at 1167; *Rubsam v. Estate of Pressler* (1989) 4th Dist. Ind.App., 537 N.E.2d 520, 522,

*trans. denied; Gonterman, supra* at 815; *Jarvis Drilling, supra* at 826; *Swanson v. Wabash College* (1987) 1st Dist. Ind.App., 504 N.E.2d 327, 332.

■ The principal in this scenario is the Lottery Commission, as it is the entity which Cartwright seeks to hold liable as a party to the contract. However, there is no evidence in the record that the Lottery Commission made any kind of direct or indirect manifestation which would "clothe" Nobles, Moreau, or Hamilton with the requisite apparent authority to bind the Lottery Commission to the purported contract. Indeed, the record discloses that the Lottery Commission itself was conspicuously uninvolved in the matter.[28] Accordingly, the trial court erred in refusing to grant summary judgment for the Lottery Commission upon the breach of contract issue because Cartwright has not set forth specific facts to demonstrate a genuine issue for trial.[29]

### CONCLUSION

The trial court erred in determining that a genuine issue of material fact remains in this case with regard to Cartwright's retaliatory discharge claim. Summary judgment for Nobles and the Lottery Commission upon that issue is proper. The trial court erred in determining that the trier of fact must ultimately resolve whether the information contained in Cartwright's sworn statement and its accompanying documentation is "of legitimate public interest." Summary judgment with regard to all Appellants upon that issue is proper. The trial court also erred in determining that a genuine issue of material fact remains with regard to Cartwright's breach of contract claim. Summary judgment with regard to all Appellants upon that issue is also proper.

The judgment of the trial court is reversed and the cause is remanded with instructions

---

**28.** Neither Crawford nor any other Lottery employee conveyed to Cartwright that Nobles, Moreau, or Hamilton had such authority. No matter how likely it appears that they could have exercised the requisite unofficial authority to do so, none of them had the statutory authority to carry out the promise. Under Indiana law, such bald assertions, without some form of communication or ratification by the Lottery itself, are insuffi-

cient to bind the Lottery to this purported contract.

**29.** Because the above discussion is dispositive, we need not address Appellants' alternate argument, that Cartwright has waived her right to enforce the purported contract.

to enter judgment consistent with this opinion.

SHARPNACK, C.J., and
FRIEDLANDER, J., concur.